UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

BRIDGET CAPOBIANCO, ALEX LEROY, CHRISTIAN
BATISTA, KHALIFA FALL, MARIO CAMPAZ,
MOHAMED ("MOE") TAHAT, FRANCISCO DIAZ,
CHARLES MORRIS, RYAN LEWIS, ANTHONY
CANGEMI, MICHAEL BOSCO, GARY ABRAMS, JISOO
SUN, CLAYTON TAPP, DESTINY PEREZ, ONA KELSAY,
JOSEPH PETILLO, JUSTIN TAGLIAVIA, ARTHUR DUL,
NICHOLAS VITALE, JOHNNY LUZINCOURT, MARGO
WOODLEY, GLENDESHA MACDONALD, JESSICA
WILLIAMS, RYAN PORTER, DESTINY MORENO,
JAYQUAN JOHNSON, DYLAN RICHARDSON, LIONEL
ALVAREZ, JURARD ST. HILLAIRE, KEVON YARD-
PROVIDENCE, SIDNEY LOUIS, TROY DANIELS, REN
JEFFREY, PEDERSIN PELISSIER, HENSWORTH
EDWARDS, GREGORY MAUGERI, PAUL SIMPSON,
WILLIAM GORMAN, SEYMIAH CAMPBELL, CALVIN
LUCKY, ROBERT PEARLSTEIN, MARK TURNER,
JOHNNIE ENGLISH, NESTOR HERNANDEZ, JACQUIL
CAMPBELL, , , RAYSHAWN MOORE, SIMON
VIKTORENKO, RAFAEL HERNANDEZ, JAVAAS
WEBSTER, JOSE ROMAN, CODEY FORREST, DARIUS
JONES, JOSHUA MARSHALL, ANDRIAN JONES, RICKY
PEREZ, Individually and on Behalf of a Class of all Others
Similarly Situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK, MAYOR BILL DE BLASIO,
MARCOS GONZALEZ SOLAS, Director of the Mayor's
Office of Criminal Justice, DERMOT SHEA, Commissioner
of the New York City Police Department, ASSISTANT CHIEF
DONNA JONES, Commanding Officer of the New York City
Police Department's Criminal Justice Bureau, JANINE
GILBERT, Assistant Deputy Commissioner of the New York
City Police Department, LISETTE CAMILO, Commissioner of
the Department of Citywide Administrative Services, DEPUTY
INSPECTOR GARFIELD MCLEOD, Commanding Officer
of Brooklyn Court Section, CAPTAIN STANLEY GEORGE,
Commanding Officer of Bronx Court Section, CAPTAIN
NOEMA IOFFE, Commanding Officer of Manhattan Court

**AMENDED CLASS ACTION
COMPLAINT**

1:21-CV-06125 (LDH) (VMS)

Jury Trial Demanded

Section, CAPTAIN MICHAEL CORBETT, Commanding
Officer of Queens Court Section, LIEUTENANT CARMEN
LOPERENA, Commanding Officer of Richmond County Court Section,
Section, LIEUTENANT KELLEY SEALEY, former
Commanding Officer of Richmond County Court Section,
JOHN/JANE DOES 1-10 (unidentified officials also liable for
the conditions in the City of New York's Central Booking
facilities),

                                        Defendants.

-------------------------------------------------------------------------- x

## PRELIMINARY STATEMENT

    1.  This is a civil rights class action, brought pursuant to 42 U.S.C. § 1983, in which the Plaintiffs, on behalf of themselves and all other similarly-situated persons who were detained pre-arraignment in the City of New York's Central Booking facilities (the "Class"), allege that the City of New York and officials and employees of the New York City Police Department ("NYPD"), the Department of Citywide Administrative Services ("DCAS"), the Mayor's Office, and other agencies of the City of New York, violated their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, during the Class Period of February 2020 to the present ("Class Period"), when the Covid-19 pandemic began in New York.  The defendants subjected Plaintiffs and the Class to unconstitutional conditions of confinement in the City's Central Booking facilities by: (a) failing to provide protections to prevent Central Booking pre-arraignment detainees from contracting Covid-19 in holding cells, and (b) allowing other jail conditions to continue that provide a breeding ground for Covid-19. The NYPD command designation for the Central Booking facilities are known as Court Sections.

    2.  Despite a mayoral administration and other governmental officials who are fixated on preventing Covid-19 transmission among New York residents, the defendants have demonstrated deliberate indifference to preventing individuals they perceive as criminals or

unworthy from being exposed to or contracting Covid-19.  Defendants have also shown a disregard as to whether the Plaintiffs and the Class transmit Covid-19 to others.

3.  In the City's Central Booking facilities, the defendants have a policy, practice or custom of not providing detainees with masks; not requiring detainees who enter with their own masks to wear them correctly; holding detainees in overcrowded or crowded cells preventing them from being able to socially distance; not enforcing the requirement that staff wear masks; not sanitizing the cells or providing detainees with the ability to wash their hands; not taking the temperatures of detainees during admission; not asking new admissions if they have Covid-19 symptoms or recently were exposed to the virus; not administering rapid Covid-19 tests to those who may have the virus; and not isolating detainees with the virus from other detainees.  Further, a spokesperson for the municipal agency DCAS recently reported to the news media that they tested the air filtration systems in the courts and cell areas, in response to complaints from public defender unions, and rated them as "poor."[1]

4.  On March 11, 2021, the Daily News published an article entitled,  "*Exclusive*:" "*Cramped holding cells in NYC courthouses omitted from COVID-19 ventilation upgrade; 'They're like pens that animals are held in.'*" The article reported that while the City's courthouses received upgraded, state of the art, air filtration and ventilation systems to address the Covid-19 pandemic, the holding cells at the courthouses were omitted from the upgrades. Indeed, DCAS reported a "low level" of air filtration in the cells.  A lawyer working with

---

[1] https://www.nydailynews.com/coronavirus/ny-covid-rally-courthouse-conditions-daily-news-investigation-state-courts-20210901-nejw3ytl7jenrmvizy3537u4ae-story.html; https://legalaidnyc.org/news/nyc-must-remedy-dangerous-conditions-courthouse-holding-areas/; https://www.nydailynews.com/new-york/manhattan/ny-oca-dcas-nypd-doc-holding-cells-filthy-court-part-areas-health-risk-covid-20210713-kegid67syzgbvc56stvgc3r7iq-story.html; https://legalaidnyc.org/news/disgusting-conditons-nyc-courthouses.

prisoners observed the sordid state of the cells stating, "They're like pens that animals are held in, in farms. They're usually packed full of people . . . We've gotten reports from [detained] people that are scared they're going to die, and rightfully so." The article additionally reported that NYPD Assistant Deputy Commissioner Janine Gilbert recognized the abysmal conditions and "described cells that hold 150 people, but have only one toilet and no beds. Some cells had running water, but none had hand sanitizer."[2]

5.  The prior Mayor, Bill de Blasio, recently erroneously stated to the media that he thought the State of New York, not the City, was responsible for maintaining proper court and jail conditions.[3]

6.  As a result of the failure of leadership and competence at the top of the chain of command, despite knowing the dangerous state of the holding cells in Central Booking, numerous court and central booking employees have contracted Covid-19, as well as attorneys, detainees, criminal defendants and visitors.

7.  In addition to the absence of protections from contracting Covid-19,the cells in the City's Central Booking facilities are notoriously filthy and inhumane, which provide a breeding ground for viruses like Covid-19. These inhumane conditions have existed for decades and have been the subject of several lawsuits.

---

[2] https://www.nydailynews.com/new-york/manhattan/ny-dcas-oca-mocj-doc-no-ventilation-in-courthouse-holding-cells-20210312-53jxuttz3na5veup4c7mxgkhya-story.html.

[3] https://www.nydailynews.com/new-york/manhattan/ny-mayor-de-blasio-nyc-not-responsible-filth-courthouses-20210712-75ys2xagsvcgzp7dfgr27tbxsq-story.html; https://www.nydailynews.com/new-york/manhattan/ny-state-courthouses-city-filthy-non-public-areas-oca-state-legislature-20210720-n2lb36kcw5bmfiudgvqr52qis4-story.html; https://legalaidnyc.org/news/de-blasio-unsanitary-courthouse-conditions.

8.  In 2013, the plaintiffs in *Cano v. City of New York, et al.*, 13-CV-3341 (E.D.N.Y.), brought claims challenging the unconstitutional conditions that were present in Brooklyn Central Booking ("BCB') when they were held in the facility on separate dates from 2010 to 2013.  The district court, after discovery, granted the defendants' motion for summary judgment.  On appeal, under the caption *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the Second Circuit reversed, stating that the "plaintiffs paint a picture of BCB that is *alarming and appalling*" and have "adduced *substantial evidence, much of it uncontroverted*, that they were subjected to appalling conditions of confinement to varying degrees and for various time periods." *Id.* at 26, 37 (emphasis added).

9.  Despite the language in the Second Circuit's decision in *Darnell*, defendants have done nothing to improve the conditions in BCB or the other central booking facilities during most, or for the duration of the pandemic.  The defendants' practices could have resulted in detainees dying from Covid-19 or becoming seriously ill.  However, it is not necessary that a plaintiff  contract Covid to have a viable claim.  Creating a risk to health is sufficient.  As stated by the Second Circuit in *Darnell*, "to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive *risk* to health or safety." *Id.* at 35  (emphasis added); *see also Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) ("We have held that prisoners may not be deprived of their ''basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety' — and they may not be exposed 'to conditions that 'pose an unreasonable *risk*

5

of serious damage to [their] future health.'") (emphasis added); *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) ("Finally, the district court'' imposition of a third requirement— that an inmate 'claim[] that he suffered sickness or other ill effects" to establish a violation — fares no better.  Although the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure, *serious injury is unequivocally not a necessary element* of an Eighth Amendment claim.") (emphasis added).

10.  Plaintiffs and the Class seek: (1) a declaratory judgment that the conditions of confinement in the City's Central Booking facilities during the Class Period were unconstitutional; (2) an injunction requiring defendants to remediate the unconstitutionally inhumane conditions; (3) compensatory damages for the injuries caused by defendants' unlawful conduct; (4) punitive damages assessed to deter such intentional or reckless deviations from well-settled constitutional law; (5) damages and bonuses for the class representatives; and (6) attorney's fees and costs.

## JURISDICTION & VENUE

11.  This action is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution and New York state law.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

12.  Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because the City of New York and the individual Defendants are located in this District and many of the events at issue occurred here, specifically in Brooklyn, Queens and Staten Island.

## JURY TRIAL

13.  Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a jury trial.

## PARTIES

14. Plaintiffs are residents of the State of New York or other states.

15. The City of New York is a municipal corporation organized under the laws of the State of New York.

16. The City and the municipal officials and employees named as defendants in the caption, and others yet to be identified, were responsible for the conditions of confinement in the City's Central Booking facilities and for taking reasonable steps to prevent Covid-19 transmission when Plaintiffs and the Class were held in the facility. The individual defendants acted under color of state law at all relevant times herein. The individual defendants are sued in their individual capacities. Because pre-arraignment detainees suffered, as described above, after a consent order was issued in this case mandating changes, plaintiffs may add the current Mayor, members of his administration, and other NYPD and DCAS officials as defendants.

## CLASS ALLEGATIONS

17. Plaintiffs seek to represent a class, pursuant to F.R.C.P. 23(b)(2) and (b)(3), on behalf of themselves and all other similarly situated individuals, and seek to represent a class comprised of all persons who were detained in the City's Central Booking facilities from February 2020 to the date in which defendants are ordered to remedy, and do in fact remedy, the unconstitutionally inhumane condition in the City's Central Booking facilities.

18. Plaintiffs and the Class seek a declaration that the inhumane conditions of confinement during the class period were unconstitutional; an order requiring defendants to remedy the unconstitutional conditions; compensatory damages for the injuries caused by defendants' unconstitutional conduct; and punitive damages.

**Numerosity**

19.  The members of the Class are so numerous — hundreds of thousands of individuals — as to render joinder impracticable.  Upon information and belief, there have been and continue to be hundreds of thousands of persons detained in the City's Central Booking facilities during the Class Period, all of whom are members of the Class, and all whose federal constitutional rights have been or will be violated by the policy, practice and/or custom of maintaining unconstitutional conditions.

**Commonality**

20.  The questions of law and fact common to the class include whether the class members have common rights under the United States Constitution to be free from unconstitutional conditions while detained, whether defendants' conduct in confining the Class members under these conditions violated those rights, and whether what took place is or was a policy, practice and/or custom of the City of New York and caused by the defendants.

**Adequacy of Representation**

21.  Plaintiffs are adequate Class representatives.  The violations of law alleged by the Plaintiffs stem from the same course of conduct by defendants that violated and continue to violate the rights of members of the class. Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.

22.  The undersigned attorneys are experienced in class action and civil rights litigation and will vigorously prosecute this action and protect the interests of the class.  Further, counsel has the resources, expertise and experience to prosecute this action, and counsel knows of no conflicts among the members of the class.

**Typicality**

23.  Plaintiffs are typical of the class they seek to represent.  The legal theory under which the Plaintiffs seek relief is the same or similar to that on which the Class will rely. Further, the harm suffered by the Plaintiffs is typical of the harm suffered by the absent Class members.

**Superiority**

24.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because (a) the prosecution of thousands of separate actions would be inefficient and wasteful of legal resources; (b) the members of the class may be scattered throughout New York State and the tri-state area and are not likely to be able to vindicate and enforce their constitutional and statutory rights unless this action is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; and (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against defendants which would establish incompatible standards of conduct for defendants.

**Predominance of Common Issues**

25.  Defendants have acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate. In addition, questions of law and/or fact common to members of the class, especially on issues of liability, predominate over any questions that affect individual members.

## STATEMENT OF FACTS

**A. Background Regarding Conditions in the City's Central Booking Facilities**

26. The deplorable conditions that exist in the City of New York's Central

Booking facilities were the subject of a New York Times article, published March 23, 1990,

entitled, "*Trapped in the Terror of New York's Holding Pens*." As the Times reported,

> They are the holding pens and precinct house cells where people who have
> been arrested are warehoused - often for two or three days - before they are
> taken to court. Built decades ago for a different New York, they were meant
> to hold people for hours, not days, and they are by all accounts too small for
> the thousands of people now frequently crammed into them each
> week….There are no mattresses, no bedding, no clean clothing and no
> showers. The toilets, where there are toilets at all, are open bowls along the
> walls and often encrusted and overflowing. Meals usually consist of a
> single slice of baloney and a single slice of American cheese on white
> bread….People who have been through the system say it is not easy to
> forget. Some were threatened by other prisoners. Others were chained to
> people who were vomiting and stinking of the streets. With few phone
> privileges, many felt as if they were lost in a hellish labyrinth far from the
> lives they had been plucked from.

27. Further, 30 years ago, the City of New York and high-ranking City officials

were put on notice of the conditions of the City's Central Booking facilities when, on March 6,

1990, the Legal Aid Society sent a letter to then-Deputy Mayor Milton Mollen, outlining,

pursuant to Mollen's suggestion, the nature of the conditions in the City's Central Booking

facilities.

28. The letter stated, in relevant part, as follows:

> All court detention and central booking facilities are chronically overcrowded.
> There are no established limits for cell population. Some of the cells are less than
> 12 by 15 feet, and may be crammed with as many as 25 people. There is rarely
> seating for more than half of the detainees causing arrestees to stand or sit on the
> floor…even though arrestees are held for two or three nights, there are no sleeping
> facilities[,] meaning that people either do not sleep during their detention or must
> try to sleep on a cold, filthy concrete floor with nothing more than a jacket or shirt
> bundled up as a cushion. Often arrestees are crowded together, virtually lying on
> top of each other.

10

The toilets are either in full view or partly concealed by low partitions. They are often broken or backed up. Occasionally, toilets overflow onto the floor. [The cells] are filthy and malodorous … infested with roaches and rats and there is usually garbage all over the floor. The odor is so pungent that attending officers have been observed burning incense. [The cells are] poorly ventilated, and some are not ventilated at all. [The cells in Brooklyn are located in the sub-basement] with no provision for ventilation. In hot summer months, long hours spent in a stifling, vile-smelling, unventilated holding pen are unbearable. Lighting is dim and often non-existent.

[Once an arrestee reaches a Central Booking facility, the City] provides only bologna and cheese sandwiches and only at specified times. Because of the cramped conditions of the cells, detainees often have to eat near the open toilet. Many detainees, who are in transit when the sandwiches are given out, must endure long periods with no food at all.

[There is] no medical care in the pens. Prisoners with serious problems may remain untreated for several days. Diabetics and AIDS victims may be unable to obtain their medicine. Physically sick and psychotic arrestees are thrown in with the others and mingle in close proximity for days. Arrestees who request medical attention are discouraged from pursuing their requests. [The arrestees are told that medical care is] available only at a hospital and will delay their arraignment by a day or more. [Only if an arrestee is] insistent or obviously ill, for example, bleeding or unconscious, is he or she taken to a hospital.

29. The Legal Aid Society's March 6, 1990 letter was received and reviewed by then-Deputy Mayor Mollen and other City officials. Upon information and belief, the municipal officials confirmed that the conditions described in the letter did in fact exist.

30. The conditions described in the Legal Aid Society's letter still existed in large part when *Cano v. City of New York* was filed in the Eastern District in 2013.

31. The conditions described in the Legal Aid Society's letter existed in large part when Plaintiffs and the Class were held in Central Booking.[4]

---

[4] https://abc7ny.com/dirty-courthouses-nyc-court-unsanitary-legal-aid/10882332.

32.  In addition to the above, the City of New York and high-ranking City officials were put on notice of the inhumane conditions of BCB almost twenty years ago when *Spinner v. City of New York*, *et al*., 01-CV-2715 (E.D.N.Y.) was filed, which like *Cano v. City of New York,* alleged unconstitutional jail conditions in BCB in violation of the multiple plaintiffs' rights under the Due Process Clause.  *See, e.g., Spinner v. City of New York*, *et al.*, 2004 U.S. Dist. LEXIS 2541 (E.D.N.Y. Feb. 19, 2004).  Moreover, there are pending proposed class actions regarding the inhumane conditions of BCB, before the Covid-19 pandemic, being prosecuted by the undersigned entitled *Brennan, et al., v. City of New York, et al.*, 19-CV-2054 (NGG) (CLP) and *Aboubakar, et al. v. City of New York, et al.,* 20-CV-1716 (NGG) (CLP).

33.  The Plaintiffs in this case were held for at least several hours in one of the City's Central Booking Facilities at least once on separate dates ranging from February 2020 to the present and were subjected to the conditions described above and herein.

34.  Bridget Capobianco was held in BCB on or about July 27, 2020; Alex Leroy was held in BCB in February 2021; Khalifa Fall was held in BCB on or about March 11, 2021; Mario Campaz was held in BCB in September and October 2020; Mohamed Tahat was held in BCB on or about May 8, 2020 and July 28, 2020; Francisco Diaz was held in BCB on or about September 6, 2020; Charles Morris was held in Queens Central Booking ("QCB") on or about May 21, 2021; Ryan Lewis was held in BCB in June 9, 2021 and in Manhattan Central Booking ("MCB") on February 26, 2021; Anthony Cangemi was held in BCB on or about October 8, 2020; Michael Bosco was held in BCB on or about September 24, 2020, and in Staten Island Central Booking ("SICB") on or about December 15, 2020; Gary Abrams was held in QCB on or about September 1, 2020; Clayton Tapp was held in MCB on or about March 15, 2020; Destiny Perez was held in BCB on or about June 18, 2021; Ona Kelsay was held in BCB on or about

May 14, 2020; Jisoo Sun was held in BCB on or about July 29, 2021; Joseph Petillo was held in BCB on or about July 23, 2020 and February 24, 2021; Justin Tagliavia was held in BCB on or about February 24, 2021; Arthur Dul was held in BCB on or about February 24, 2021; Nicholas Vitale was held in BCB in February 5, 2021; Johnny Luzincourt was held in BCB on or about November 8, 2020; Margo Woodley was held in BCB on or about July 28, 2020; Glendesha MacDonald was held in BCB on or about August 2, 2021; Jessica Williams was held in BCB in May 2021 and on or about September 1, 2021; Ryan Porter was held in BCB on or about November 13, 2020; Destiny Moreno was held in BCB on or about April 28, 2021; Jayquan Johnson was held in BCB on or about September 3, 2020, December 15, 2020 and January 13, 2021; Dylan Richardson was held in BCB on or about September 28, 2020, February 25, 2021 and April 28, 2021; Lionel Alvarez was held in BCB in October 2021; Jurard St. Hillaire was held in MCB on or about June 1, 2020; Kevon Yarde-Providence was held in BCB on or about July 28, 2021; Sidney Louis was held in BCB on or about April 10, 2021; Troy Daniels was held in BCB in August or September 2020 (arrest # K20625444); Ren Jeffrey was held in BCB on or about March 11, 2021; Hensworth Edwards was held in BCB on or about April 10, 2021; Pedersin Pelissier was held in BCB on or about February 19, 2021; Christian Batista was held in BCB on or about October 10, 2020; Gregory Maugeri was held in BCB on or about March 20, 2021; Paul Simpson was held in Bronx Central Booking ("BXCB") on or about October 9, 2020, and in QCB on or about March 15, 2021; William Gorman was held in BCB on or about August 1, 2021; Rousz DeLuca was held in MCB on or about May 30, 2020; Jose Roman was held in MCB on or about May 15, 2021; Seymiah Campbell was held in BCB on or about December 14, 2021; Calvin Lucky was held in BCB on or about September 25, 2021; Robert Pearlstein was held in BCB on or about February 7, 2021; Mark Turner was held in MCB on or about May 8,

2021; Johnnie English was held in BCB on or about February 14, 2022; Nestor Hernandez was held in BCB on or about October 31, 2021; Jacquil Campbell was held in QCB on or about February 21, 2021, and other dates; Rayshawn Moore was held in BCB on or about November 27, 2020, December 30, 2021, and January 6, 2022; Simon Viktorenko was held in SICB on or about January 15, 2022; Rafael Hernandez was held in BCB on or about January 1 and 7, 2022; Javaas Webster was held in BCB on or about January 13, 2022; Codey Forrest was held in MCB on or about June 1, 2020 and in BCB on or about October 6, 2020; Darius Jones was held in BCB on or about April 20, 2021; Joshua Marshall was held in BCB on or about August 19, 2021 and January 5, 2022; Andrian Jones was held in BCB on or about September 17, 2021 and January 5, 2022 ; and Ricky Perez was held in BCB on or about April 19, 2021.

**B. The Conditions Regarding the Lack of Protections Against Covid-19**

35.   In the City's Central Booking facilities, the defendants have a policy, practice or custom of not providing detainees with masks; not requiring detainees who entered with their own masks to wear them correctly; holding detainees in overcrowded or crowded conditions preventing them from being able to socially distance; not enforcing the requirement that staff wear masks; not sanitizing the cells or providing detainees with the ability to wash their hands; not taking the temperatures of detainees during admission; not asking new admissions if they have Covid-19 symptoms or recently were exposed to the virus; not administering rapid Covid-19 tests to those who may have the virus; and not isolating detainees with the virus from other detainees.  Further, as stated above, a spokesperson for the municipal agency DCAS recently reported to the news media that they tested the air filtration systems in the courts and cell areas, in response to complaints from public defender unions, and rated them as "poor."

36.  The defendants did not follow any of the established guidance on how jails and correctional institutions should mitigate the risks of transmitting Covid-19.  The Center for Disease Control issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities."  This guidance emphasizes the need for: (a) cleaning and disinfecting shared areas and equipment several times daily with soap and hot water; (b) provision of free hygiene products such as soap and tissues, as well as alcohol-based hand sanitizer, if possible; (c) social distancing; (d) constant use of personal protective equipment by staff and inmates; (e) creation of a plan to ensure COVID-19 evaluation and testing; (f) medical isolation of confirmed and suspected cases; (g) identifying and quarantining of persons in contact with those confirmed and suspected cases; and (h) special protection for at-risk individuals.  *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC, 2 (last updated Mar. 23, 2020).[5]

37.  None of the above is being followed by defendants.

38.  A World Health Organization report on COVID-19 prevention in detention facilities recommends that "physical distancing should be observed"; "wall-mounted liquid soap dispensers, paper towels and foot-operated pedal bins should be made available"; medical masks should be provided and not be reused; surfaces should be regularly disinfected; and appropriate action should be taken for confirmed cases, "including transfer to specialist facilities for respiratory isolation."  Preparedness, Prevention, and Control of COVID-19 in Prisons and Other Places of Detention, WHO Regional Office for Europe 1, 9, 19-23 (Mar. 15, 2020).[6]

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[6] http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control- of-COVID-19-in-prisons.pdf.

39.  None of the above is being followed by defendants.

40.  Defendants have failed to follow standard Covid-19 safety protocol even though the local federal courts have recognized the dangers of Covid-19 in the jail and prison environment.  On March 20, 2020, the Second Circuit acknowledged the "grave and enduring" risk posed by COVID in the correctional context.  *Fed. Defs. of New York Inc.v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020); *see also United States v. Skelos*, 15-CR-317 (KMW), 2020 U.S. Dist. LEXIS 64639, at *3 (S.D.N.Y. Apr. 12, 2020) ("Jails and prisons are powder kegs for infection."); *United States v. Mongelli*, No. 02-CR-307 (NGG), 2020 U.S. Dist. LEXIS 146478, at *7 (E.D.N.Y. Aug. 14, 2020) ("As this court has previously noted, the COVID-19 pandemic poses a serious health risk to this country's prison populations") (citing *United States v. Donato*, Nos. 03-CR-929-9, 05-CR-60-10 (NGG), 2020 U.S. Dist. LEXIS 118061, 2020 WL 3642854, at *2 (E.D.N.Y. July 6, 2020) and *United States v. Porges*, No. 17-CR-431 (NGG), 2020 U.S. Dist. LEXIS 113164, 2020 WL 350415, at *2 (E.D.N.Y. June 29, 2020)); *United States v. Williams*, 16-CR-526 (LGS), 2020 U.S. Dist. LEXIS 224698, at *4 (S.D.N.Y. Dec. 1, 2020) ("Courts have also recognized that individuals in confinement settings may be at a 'heightened risk of contracting COVID-19.'") (citations omitted).

41.  Specific to the City of New York, the Brennan Center for Justice first reported in 2020:

> On March 8, a report from the Board of  Corrections revealed that conditions in New York City jails have not improved in the year since the pandemic began.  The report showed that the jails do not have comprehensive distancing measures and mask mandates in place, despite research over the past year about how the virus spreads.

As of March 10, there were over 5,500 people being held in New York City jails, a higher population than before the pandemic started.  Doctors are concerned that the increase in the number of people coupled with unsanitary conditions and a lack of social distancing and masking in jails could lead to another major outbreak in the jails.[7]

## C. The Conditions in the City of New York's Central Booking Facilities are a Breeding Ground and a Superspreader Event for Covid-19

42.   The inhumane, filthy and unhygienic conditions described below, which were listed by the Second Circuit in *Darnell*, provide a breeding ground and are a super-spreader event for the transmission of Covid-19.  In addition, some of the conditions lower the immunity of the detainees.  The conditions are also unconstitutional without regard to Covid-19.

43.   **Overcrowding**: Plaintiffs and the Class were packed into overcrowded or crowded cells.  Because the cells were so full, there was often only space to stand for hours at a time.  When a space opened up, the Plaintiffs and the Class could sit or lie down on the filthy, hard ground.  While some of the cells contained hard benches, there was not nearly enough bench space to accommodate the numerous occupants.  These conditions increase the chances of spreading Covid-19.

44.   **Unsanitary Toilets**:  Each cell contained one exposed toilet that lacked a seat, lid, or sufficient privacy partitions to conceal the user from his or her fellow detainees.  The toilet rim and bowl, along with the surrounding floor and walls, were often covered with some combination of feces, vomit, urine and other excrement.  The toilets were frequently clogged and

---

[7] https://www.brennancenter.org/our-work/research-reports/reducing-jail-and-prison-populations-during-covid-19-pandemic#.YSjQbVNXfao.gmail.

would overflow.  The smell was horrific and overbearing.  Toilet paper was usually not provided

to detainees; even upon request, the officers chose instead to engage in personal conversations

with each other, play on their cell phones, and ignore this and every other type of reasonable

request.  Plaintiffs and the Class who had no choice but to use the toilets were exposed to

bacteria and Covid-19.

45.  **Garbage and No Sanitizing and Sanitation**:  The cells had garbage scattered

over the ground as well as urine, feces and other excrement splattered in sections of the floor.

Because there were no trash cans in the cells, detainees were expected to put their garbage on the

floor.  The overwhelming majority of Plaintiffs did not observe anyone clean or sanitize the cells

when they were held in the facility and the one or two that observed a cleaning saw that it was

quick, superficial and inadequate.  This garbage and the lack of sanitizing and cleaning exposed

the Plaintiffs and the Class to bacteria and Covid-19.

46.  **Infestation**:  Most of the Plaintiffs and Class members were held in cells

which were infested with cockroaches, flies and other insects.  Some of the Plaintiffs observed

rodents in the cells.  Scientists and medical professionals are researching whether the virus may

be transmitted by these creatures.

47.  **Lack of Toiletries and Other Hygienic Items**:  Plaintiffs and the Class were

not provided with basic toiletries, such as face masks, soap, tissues, hand wipes, hand sanitizer,

toothbrushes or toothpaste.  Moreover, as stated, detainees were denied toilet paper.  Other types

of hygienic items were simply not provided.  In fact, toiletries and hygienic items have never

been provided.

48.  **Inadequate Nutrition and Water**:  The food and water provisions were

nutritionally inadequate.  Plaintiffs and the Class were not provided with fresh, clean drinking

water, and for most of the Plaintiffs and Class members, the only water available was from a

dirty sink  adjacent and attached to a filthy toilet.  Adequate food was not provided.  If

sandwiches were offered, they were moldy, rotten, stale, or otherwise inedible.  Some of the

Plaintiffs and Class members were given a small box of cereal, but were not given plastic

utensils or a bowl in which to eat the cereal.  Some of the Plaintiffs and Class members were

offered a small carton of milk, instead of water, but were unable to drink it because it was

spoiled or beyond the expiration date.  Even though the Plaintiffs and the Class were hungry and

dehydrated, many feared consuming the inedible milk and food out of fear that it would cause

them to become sick and force them to utilize the horrid toilets.  Not being provided with

essential food and water lowers one's immunity.

      49.  **Extreme Temperatures and Poor Ventilation**:  Most of the Plaintiffs and

Class members were subjected to extremely cold or hot temperatures.  Moreover, the cells lacked

ventilation, which exacerbated the horrific odors caused by the toilets, the overcrowding and the

detainees who were not given the opportunity to wash themselves.  Some officers have fans

blowing on them, but not on the detainees.  As stated earlier, the City agency DCAS inspected

the air filtration systems and rated them as "poor."

      50.  **Sleep Deprivation**:  After being arrested and held in a NYPD police precinct

for hours, Plaintiffs and the Class were held overnight or for a substantial number of hours in

Central Booking and suffered sleep deprivation because they were not provided with any

sleeping provisions, such as mats, beds, cots, pillows or blankets.  Moreover, for most people, it

is impossible to sleep in the environment of a Central Booking cell.  Some of the Plaintiffs and

Class members were so desperate that they attempted to sleep on the filthy, hard floor (some near

the toilet), or on one of the hard benches in the cells.  Even if a detainee chose to disregard the

19

filth, there was generally no room on the floor to lie down due to the overcrowding.  Exhaustion is well-known to lower a person's immunity.

51.  **Crime**:  Plaintiffs and the Class were held in cells which were for the most part unsupervised and where officers were deliberately indifferent to various crimes, violations and infractions, such as smoking marijuana and tobacco, the smoke of which may contain virus particles.

**D. Municipal and Supervisory Liability**

52.  The City of New York and the municipal officials and employees listed in the caption, as well as others not yet identified, were responsible for the conditions of the City's Central Booking facilities when Plaintiffs and the Class were held in the facilities.

53.  The individual NYPD defendants were aware of the unconstitutional conditions of confinement that existed when Plaintiffs and the Class were held in the City's Central Booking facilities from personally observing the conditions, from discussions with, and reports from, subordinates and other municipal officials and employees, from documents concerning the conditions, from letters and complaints from detainees and City employees, and from  lawsuits.

54.  Many of the individual defendants have been inside and have walked through, visited and/or toured the City's Central Booking facilities as part of their duties and responsibilities.

55.  Some of the individual defendants were responsible for setting the final policies on the operation of the City's Central Booking facilities when Plaintiffs and the Class were held in the facilities  The actions of these final policymakers may be imputed to the City.

56. The City and the individual defendants failed to implement adequate remedial measures to address the unlawful conditions in the City's Central Booking facilities when Plaintiffs and the Class were held in the facilities and tacitly authorized the conditions.

57. The City of New York, as an entity, had actual and/or constructive notice of the unlawful conditions that existed in its Central Booking facilities when Plaintiffs and the Class were held in the facilities through the observations of its high-level officials, including policymakers, from reports from municipal officials and employees, from documents, letters and complaints from detainees and City employees, and from lawsuits.

58. The unlawful conditions described herein have been in existence for decades and constitute a persistent, well-settled, and pervasive practice or custom that the City of New York and its high-level officials, including final policymakers, have allowed to exist, despite the injurious effects that the conditions have had on pre-arraignment detainees. Despite having both actual and constructive notice of the unlawful conditions, the City and high-level municipal officials, including final policymakers, failed to implement adequate remedial measures and tacitly authorized the conditions. This deliberate indifference has crossed over to failing to protect detainees from contracting Covid-19.

59. The City and high-level municipal officials, including final policymakers, have exhibited deliberate indifference to the unlawful conditions that have existed in the City's Central Booking facilities when Plaintiffs and the Class were held in the facility by failing to train municipal employees, contractors and agents on how to maintain safe and humane conditions in the facility, by failing to retrain, discipline and/or terminate those who contributed to the deprivations; and by not allowing non-law enforcement personnel to enter and sanitize the cells. Rather than take appropriate remedial action, the City and high-level municipal officials,

21

including policymakers, knowingly acquiesced in the unlawful behavior of their subordinates, contractors and agents.

60. The final policymakers who set policy regarding the conditions in the City's Central Booking facilities include, but are not limited to, former Mayor Bill de Blasio; Marcos Gonzalez Solas, Director of the Mayor's Office of Criminal Justice; Dermot Shea, former Commissioner of the NYPD; Assistant Chief Donna Jones, Commanding Officer of the NYPD Criminal Justice Bureau, which oversees Central Booking; Janine Gilbert, Assistant Deputy Commissioner of the NYPD, who reported to the news media on the specifics of the conditions and has defended them; Lisette Camilo, Commissioner of DCAS, and the commanding officers of each Central Booking facility. In two prior lawsuits concerning BCB, the New York City Law Department represented that the commanding officers of each Central Booking facility is a final policymaker.

**E. Damages**

61. As a result of defendants' actions, Plaintiffs and the Class suffered damages, including, but not limited to, emotional distress, mental anguish, fear and anxiety over contracting Covid-19 and possible suffering serious illness or death, fear and anxiety of spreading the virus to loved ones when they are released and return home, medical expenses, and hunger, thirst, dehydration, sleep deprivation, body and head pain, significant physical discomfort, pain from not bring able to use the toilet, and other personal injuries.

## FIRST CLAIM

### § 1983; VIOLATION OF DUE PROCESS
(On Behalf of Plaintiffs and the Class Against all Defendants)

62. Plaintiffs repeat the foregoing allegations as if set forth fully herein.

22

63.   The Due Process Clause of the Fourteenth Amendment imposes a duty on municipalities and municipal officials and employees to take reasonable measures to ensure that pre-trial detainees are held under safe and humane conditions.

64.   Moreover, because pre-trial detainees have not been convicted of any crime and are presumed innocent, they may not be punished in any manner.  Accordingly, punitive or punishing conditions of confinement may not be lawfully imposed on them.

65.   The defendants breached their duty under the Fourteenth Amendment and/or punished Plaintiffs and the Class by subjecting them to conditions that, either alone or in combination, posed an unreasonable risk to the health or physical and mental soundness of Plaintiffs and the Class.

66.   The defendants were deliberately indifferent to the unlawful conditions of the City's Central Booking facilities as they knowingly imposed the conditions or recklessly failed to act with reasonable care to mitigate or lessen the risk that the conditions posed to the Plaintiffs and the Class, even though the defendants knew, or should have known, that the conditions posed an excessive risk to Plaintiffs and the Class's health or safety.

67.   The  unconstitutional conditions that existed in the City's Central Booking facilities when Plaintiffs and the Class were held in the facility were a policy, practice and/or custom of the City of New York.

68.   Defendants' conduct caused Plaintiffs and the Class to suffer various personal injuries, including the injuries described herein.

69.   As a result of the foregoing, Plaintiffs and the Class are entitled to injunctive relief and compensatory and punitive damages in an amount to be determined at trial.

## SECOND CLAIM

### § 1983; FAILURE TO INTERVENE
(On Behalf of Plaintiffs and the Class Against the Individual Defendants)

70.  Plaintiffs repeat the foregoing allegations as if set forth fully herein..

71.  The individual Defendants, while acting under color of state law, had a reasonable opportunity to prevent the violations of the rights of Plaintiffs and the Class under the Fourteenth Amendment, but they failed to fulfill their constitutional obligation to intervene and address the unlawful conditions that existed in the City's Central Booking facilities when Plaintiffs and the Class were held in the facilities.

72.  Defendants' conduct caused Plaintiffs and the Class to suffer various personal injuries, including the injuries described herein.

73.  As a result of the foregoing, Plaintiffs and the Class are entitled to injunctive relief and compensatory and punitive damages in an amount to be determined at trial.

## THIRD CLAIM

### NEW YORK STATE CONSTITUTION & COMMON LAW
(On Behalf of Plaintiffs and the Class Against all Defendants)

74.  Plaintiffs repeat the foregoing allegations as if set forth fully herein.

75.  The foregoing conduct violates the New York State Constitution and New York common law.

76.  Because this action is brought in the public interest and to vindicate the rights of others, New York law does not require a notice of claim as a condition precedent to asserting claims against a municipality under state law.

77.  The defendants owed a duty of due care to the Plaintiffs and the Class and breached that duty.

24

78.  The individual defendants were employees and agents of the City of New York and were at all relevant times acting within the scope of their employment.  Thus, the City is vicariously liable for their actions under the doctrine of *respondeat superior*.

79.  As a result of the foregoing, Plaintiffs and the Class are entitled to injunctive relief and compensatory and punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs request the following relief jointly and severally against the Defendants:

a.    An order certifying the Class;

b.    a declaratory judgment that the conditions of confinement in the City's Central Booking facilities during the Class Period were unconstitutional;

c.    An injunction requiring defendants to remedy the unconstitutional conditions in the City of New York's Central Booking facilities;

d.    Compensatory damages in an amount to be determined by a jury;

e.    Punitive damages in an amount to be determined by a jury;

f.    Attorney's fees and costs;

g.    In addition to damages, bonuses to the class representatives for their time and effort prosecuting this case; and

h.    Such other and further relief as the Court may deem just and proper.

DATED:  March 16, 2022

*/s/ Richard Cardinale*

_____
RICHARD CARDINALE
Attorney at Law
26 Court Street, Suite # 1507
Brooklyn, New York 11201
(718) 624-9391

25

STEPHEN BERGSTEIN
BERGSTEIN & ULLRICH
Attorneys at Law
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277

CATHERINE E. ANDERSON
JASON SOLOTAROFF
GISKAN SOLOTAROFF & ANDERSON LLP
Attorneys at Law
90 Broad Street, 2ndFloor
New York, New York 10004
(212) 847-8315

Attorneys for Plaintiffs and the Class

26