UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
BRIDGET CAPOBIANCO et al.,

                    Plaintiffs,

        -against-

THE CITY OF NEW YORK et al.,

                    Defendants.
------------------------------------------------------------- x

**REPORT AND RECOMMENDATION**

21 Civ. 6125 (LDH) (VMS)

**Vera M. Scanlon, United States Magistrate Judge:**

## I.    INTRODUCTION

Plaintiffs Bridget Capobianco, Alex Leroy, Christian Batista, Khalifa Fall, Mario Campaz, Mohamed ("Moe") Tahat, Francisco Diaz, Charles Morris, Ryan Lewis, Anthony Cangemi, Michael Bosco, Gary Abrams, Jisoo Sun, Clayton Tapp, Destiny Perez, Ona Kelsay, Joseph Petillo, Justin Tagliavia, Arthur Dul, Nicholas Vitale,[1] Johnny Luzincourt,[2] Margo Woodley, Glendesha MacDonald, Jessica Williams, Ryan Porter, Destiny Moreno, Jayquan Johnson, Dylan Richardson, Lionel Alvarez, Jurard St. Hillaire, Kevon Yard-Providence, Sidney Louis, Troy Daniels, Ren Jeffrey, Pedersin Pelissier, Hensworth Edwards, Gregory Maugeri, Paul Simpson, William Gorman, Seymiah Campbell, Rousz DeLuca, Calvin Lucky, Robert Pearlstein, Mark Turner, Johnnie English, Nestor Hernandez, Jacquil Campbell, Simon

---

[1] Nicholas Vitale is referred to as Nickholas Vitak in Plaintiffs' declaration. <u>See</u> ECF No. 102 ¶ 29.

[2] Johnny Luzincourt is referred to as Jhony Luzincourt in Plaintiffs' declaration. <u>See</u> ECF No. 102 ¶ 26.

Viktorenko,[3] Rafael Hernandez, Javaass Webster, Jose Roman, Codey Forrest,[4] Darius Jones, Andrian Jones,[5] Ricky Perez, and Ryan Morant (collectively, "Plaintiffs") filed a putative class action complaint against the City of New York (the "City"); Mayor Bill de Blasio, in his official capacity; Marcos Gonzalez Solas, Director of the Mayor's Office of Criminal Justice, in his official capacity; Dermot Shea, Commissioner of the New York City Police Department (the "NYPD"), in his official capacity; Assistant Chief Donna Jones, Commanding Officer of the NYPD's Criminal Justice Bureau ("Ms. Jones"), in her official capacity; Janine Gilbert, Assistant Deputy Commissioner of the NYPD, in her official capacity; Lisette Camilo, Commissioner of the Department of Citywide Administrative Services, in her official capacity; Deputy Inspector Garfield McLeod, Commanding Officer of the Brooklyn Court Section, in his official capacity; Captain Stanley George, Commanding Officer of the Bronx Court Section, in his official capacity; Captain Noema Ioffe, Commanding Officer of the Manhattan Court Section, in her official capacity; Captain Michael Corbett, Commanding Officer of the Queens Court Section, in his official capacity; Lieutenant Carmen Loperena, Commanding Officer of the Richmond County Court Section, in her official capacity; Lieutenant Thomas Bouyer, Former Commanding Officer of the Richmond County Court Section, in his official capacity; Captain Damian Garcia, Commanding Officer of Queens Central Booking, in his official capacity; and John or Jane Does 1-10, unidentified officials liable for the conditions of the City's central

---

[3] Simon Viktorenko is referred to as Simon Vicktorenko in Plaintiffs' declaration.  See ECF No. 102 ¶ 39.

[4] Codey Forrest is referred to as Corey Forrest in Plaintiffs' declaration.  See ECF No. 102 ¶ 12.

[5] Andrian Jones is referred to as Adrian Jones in Plaintiffs' declaration.  See ECF No. 102 ¶ 40.

booking facilities (collectively, "Defendants"). <u>See generally</u> ECF No. 79.[6, 7]  Plaintiffs asserted

against Defendants claims for (1) violating the Due Process Clause of the Fourteenth

Amendment of the United States Constitution and 42 U.S.C. § 1983 by failing "to take

reasonable measures to ensure that pre-trial detainees are held under safe and humane

conditions," (2) violating 42 U.S.C. § 1983 by failing to intervene, and (3) violating the New

York State Constitution and New York common law. <u>See generally</u> ECF No. 79.  Defendants

answered. <u>See generally</u> ECF No. 115.

Plaintiffs moved for the issuance of a temporary restraining order and, following a

hearing, the imposition of a preliminary injunction requiring Defendants to implement the

guidance and recommendations issued by the Centers for Disease Control and Prevention (the

"CDC") on preventing the transmission of COVID-19 in prisons and jails at the City's central

booking facilities (the "TRO Motion"). <u>See generally</u> ECF Nos. 15, 16, 17 & 18.  The District

Court ordered Defendants to show cause as to why Plaintiffs' requested relief should not be

granted and scheduled a hearing. <u>See generally</u> ECF No. 19.  Defendants opposed. <u>See</u>

<u>generally</u> ECF Nos. 22, 23 & 24.  Plaintiffs replied. <u>See generally</u> ECF No. 25.  Following the

hearing, <u>see</u> 1/4/2022 Order, the TRO Motion was resolved by entry of an Order on consent of

---

[6] The Court refers to the operative pleading, which is the second amended putative class action complaint. <u>See generally</u> ECF No. 79.  Various additions and removals of parties have occurred between the filing of the original putative class action complaint, <u>see generally</u> ECF No. 1, the first amended putative class action complaint, <u>see generally</u> ECF No. 50, the second amended putative class action complaint, <u>see generally</u> ECF No. 79, and the withdrawals, <u>see generally</u> ECF No. 109.  Because these party changes are not pertinent to the analysis of the motion presently before the Court, the Court does not discuss them and, throughout this report and recommendation, refers to the operative pleading, <u>see generally</u> ECF No. 79, as modified by the withdrawals filed, <u>see generally</u> ECF No. 109.

[7] Plaintiffs are to update Defendants sued in their official capacities, as appropriate, in accordance with the Federal Rules of Civil Procedure.

Plaintiffs and Defendants, which put in effect certain measures, policies and directives through January 31, 2022 (the "Consent Order"), see generally ECF No. 27. As such, the District Court denied the TRO Motion as moot. See 4/8/2022 Order.

Plaintiffs then moved for provisional class certification for purposes of obtaining preliminary injunctive relief, including the relief sought in the TRO Motion and obtained in the Consent Order (the "PI Motion"). See generally ECF No. 28. Defendants opposed. See generally ECF No. 29. Plaintiffs replied. See generally ECF No. 30. Following a conference, see 1/20/2022 Order, the PI Motion was resolved by entry of an amended Order on consent of Plaintiffs and Defendants, which put in effect certain measures, policies and directives through January 31, 2022, to be automatically renewed for each period of thirty days thereafter for the duration of the action, absent a request for modification or termination (the "Amended Consent Order"), see generally ECF No. 35.[8] As such, the District Court denied the PI Motion as moot. See 8/26/2022 Order.

Plaintiffs have now moved for certification of the following class: "[a]ll pre-arraignment detainees in City of New York's Central Booking facilities from February 3, 2020 to the present." See generally ECF Nos. 100, 101 & 102.[9] Defendants opposed. See generally ECF

---

[8] On the motion of Defendants, and with the consent of Plaintiffs, see generally ECF No. 118, the Amended Consent Order was subsequently modified by the District Court, see 7/20/2023 Order.

[9] With their moving papers, Plaintiffs submitted the following evidence in support of their motion: 46 declarations of Plaintiffs, see ECF Nos. 102-1 to 102-40, 102-42 to 102-45 & 102-50 to 102-52; the declaration of Unique Harrison, see ECF No. 102-41; a transmission entitled, "Finest Message," from the NYPD, see ECF No. 102-46; a transmission entitled, "Chairman's Memorandum," from Allen Riley, Chairman of the New York State Commission of Correction (the "NYSCC Memorandum"), see ECF No. 102-47; a declaration of Catherine E. Anderson and firm resume for Giskan Solotaroff & Anderson LLP, see ECF No. 102-48; an affirmation of and resume for Stephen Bergstein, see ECF No. 102-49; and a declaration of Richard Cardinale, see ECF No. 102-50.

No. 103.[10]  Plaintiffs replied.  See generally ECF Nos. 104 & 105.[11]

The Court respectfully recommends that the motion for class certification be granted.

## I.  APPLICABLE STANDARD

When deciding motions for class certification, courts must consider that

Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in Falcon [Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147 (1982)] that sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  [T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-52 (2011) (citations & quotations omitted).

In light of Wal-Mart, the Court of Appeals for the Second Circuit has instructed:

(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant

---

[10] Defendants did not submit any evidence with their opposition papers.  See generally ECF No. 103.  In their memorandum of law, however, Defendants cited documents already in the Court record.  See generally ECF No. 103: an "Operations Order" from the NYPD, see ECF No. 24-4; a declaration of Ms. Jones, see ECF No. 24-1; a transcript of the hearing on the PI Motion, see ECF No. 32; data on the number of arrests by the City, see ECF No. 103 at 16; a declaration of Shefali T. Singh, see ECF No. 24; and CDC guidance documents, see ECF No. 103 at 17.

[11] With their reply papers, Plaintiffs submitted the following evidence in support of their motion: a copy of 9 NYCRR § 7506.1 (the "City Regulation"), see ECF No. 105 at 2-3; excerpts from a September 15, 2022 deposition of non-party Gary Strebel, former commanding officer of the NYPD's Criminal Justice Bureau ("Mr. Strebel"), see id. at 4-17; and excerpts from a September 21, 2022 deposition of Ms. Jones, see id. at 18-41.

facts and the applicable legal standard, that the requirement is met; (3) the
obligation to make such determinations is not lessened by overlap between a Rule
23 requirement and a merits issue, even a merits issue that is identical with a Rule
23 requirement; (4) in making such determinations, a district judge should not
assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a
district judge has ample discretion to circumscribe both the extent of discovery
concerning Rule 23 requirements and the extent of a hearing to determine whether
such requirements are met in order to assure that a class certification motion does
not become a pretext for a partial trial of the merits.

Shahriar v. Smith & Wollensky Rest. Grp., 659 F.3d 234, 251 (2d Cir. 2011) (citations omitted).

In rendering such a decision, "the district judge must receive enough evidence, by affidavits,

documents, or testimony, to be satisfied that each Rule 23 requirement has been met." Id.

(citation omitted). Resolution of any factual issues is to be made based on a preponderance of

the evidence. See Mazzei v. Money Store, 829 F.3d 260, 268 (2d Cir. 2016) (citations &

footnote omitted).

## III.    DISCUSSION

The Court below addresses (1) whether the putative class satisfies the four prerequisites

of Federal Rule of Civil Procedure 23(a); (2) whether the putative class fits one of the three class

types set forth in Federal Rule of Civil Procedure 23(b) or, alternatively, is appropriate for

certification as to particular issues pursuant to Federal Rule of Civil Procedure 23(c)(4); (3) if the

foregoing are satisfied, whether appointment of the proposed counsel for the putative class is

appropriate pursuant to Federal Rule of Civil Procedure 23(g); and, (4) if the foregoing are

satisfied, whether the putative class meets the implied ascertainability requirement.

### A.    Whether The Putative Class Satisfies The Four Prerequisites Of Federal Rule Of Civil Procedure 23(a)

Federal Rule of Civil Procedure 23(a) provides:

One or more members of a class may sue or be sued as representative parties on
behalf of all members only if:
     (1)    the class is so numerous that joinder of all members is

impracticable;

(2)        there are questions of law or fact common to the class;

(3)        the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)        the representative parties will fairly and adequately protect the interests of the class.

The Court addresses each of the four prerequisites: (1) numerosity, (2) commonality, (3) typicality and (4) fair and adequate representation.

### i.       Numerosity

The Court describes the positions of the parties then discusses and applies the legal standard for the numerosity prerequisite.

### a.       Positions Of The Parties

Plaintiffs contend that the putative class satisfies the numerosity requirement, as, at the hearing on the TRO Motion, Ms. Jones informed the District Court "that the City processes approximately 250 individuals each day in Central Bookings, most of them (approximately 185) in Brooklyn," such that the putative class "encompass[es] thousands of individuals . . . [and] easily satisfi[es] the numerosity requirement."  ECF No. 101 at 19.

Defendants do not dispute that the putative class satisfies the numerosity requirement. See generally ECF No. 103.

Plaintiffs therefore do not address the numerosity requirement in their reply.  See generally ECF No. 104.

### b.       Legal Standard

The numerosity requirement is not satisfied by a "magic number," but "numerosity is generally presumed at a level of 40 [or more] members."  Jin v. Shanghai Original, Inc., 990 F.3d 251, 263 n.20 (2d Cir. 2021) (citation & quotations omitted).

### c. Application

The putative class satisfies the numerosity requirement. There are currently 56 individually named Plaintiffs. <u>See generally</u> ECF Nos. 79 & 109. In view of Ms. Jones's statement to the District Court that the City processes approximately 250 people each day in its central booking facilities, <u>see</u> ECF No. 101 at 19, and the scope of the definition of the putative class, which encompasses all pre-arraignment detainees in the City's central booking facilities spanning from February 3, 2020 to the present, <u>see id.</u> at 10, the putative class includes hundreds of thousands of individuals.

### ii. Commonality

The Court describes the positions of the parties then discusses and applies the legal standard for the commonality prerequisite.

### a. Positions Of The Parties

At the outset, the arguments raised by both Plaintiffs and Defendants as to the commonality prerequisite focus on the law governing Defendants' potential liability in this case. In discussing the predominance inquiry pursuant to Rule 23(b)(3), <u>infra</u>, Sec. II(B)(ii)(a), the Court, as did Plaintiffs and Defendants, incorporates the causation and damages components into the analysis. The Court believes that the causation and damages discussion is also relevant to predominance.

Plaintiffs contend that the putative class satisfies the commonality requirement, as "Defendants subjected Plaintiffs and the Class to conditions of confinement that failed to provide basic protections from contracting Covid-19 in holding cells, allowed other jail conditions that fostered a breeding ground for Covid-19, and subject[ed] detainees to the unlawful conditions of confinement described by the Second Circuit in <u>Darnell</u>." ECF No. 101 at 20-21. Plaintiff

argues that,

> [w]hile members of the [putative] class were detained at different facilities, commonality is still satisfied even if policies differ in minor respects from facility to facility because an individual's custody status or their placement at a particular Central Booking facility should not render that individual more or less at risk of contracting a potentially lethal virus.

Id. at 21 (citation omitted).

Defendants counter that Plaintiffs' allegations related to COVID-19 conditions "fail to meet the commonality . . . requirement[] because Plaintiffs claim that Defendants deviated from a standardized course of conduct – CDC guidelines, Defendants' own guidelines, and this Court's consent order – so it necessarily follows that Plaintiffs allege that each Plaintiff faced an individualized course of conduct." ECF No. 103 at 12 (citation omitted). Defendants posit that "[s]ome alleged deviation from a standardized course of conduct is insufficient to meet commonality" and that proof of "systematic deviation from an acceptable policy" is required, which has not been shown here, in view of the "different experiences" described by Plaintiffs. Id. at 15-16 (citations omitted). Along those lines, Defendants point out the factual variabilities relating to Plaintiffs' allegations, in view of the NYPD's amendments to "its COVID-19 policies over time as the scientific community's understanding has evolved," the varied "approach to effectuating social distancing" in each facility due to the "distinct layouts," and the "distinct factual circumstances each day that makes each detainee's claims unique" at each facility, including mask availability. Id. at 17-18 (citations omitted).

Defendants similarly argue that the Darnell allegations "fail to meet the commonality . . . requirement[] because Plaintiffs likewise allege individualized treatment divorced from any common policy, dependent on a host of variables, and ultimately based on the discretion of the on-duty commander." Id. at 12-13. Defendants assert that "Plaintiffs point to no uniform

policy" and that "the alleged injuries are driven by discretionary decision-making [of] . . . each command officer at each distinct facility . . . based on current circumstances," which "do[] not demonstrate commonality." Id. at 16-17 (citations omitted).  Defendants point out that the conditions complained of, namely "the alleged cells' number of detainees, lack of ability to sleep and availability of seating, the sanitary condition of the cells, the sanitary condition of the toilets, the alleged presence of vermin, . . . the alleged lack of food and water," and temperature issues, are "too variable to establish commonality," which is "compounded by the fact that Plaintiffs attempt to certify a class across five facilities [where] . . . each Plaintiff was held . . . for different lengths of time." Id. at 18-19 (citations and footnote omitted).

In reply, Plaintiffs argue that they have "show[n] a common course of conduct." ECF No. 104 at 6.  With respect to the COVID-19 allegations, they have "set forth common evidence of Defendants' abject failure to implement and adhere to the most basic provisions of the CDC's Covid-19 Protocol," resulting in the denial of "sufficiently safe and hygienic conditions of confinement as required by the CDC and the New York State Commission of Correction." Id. With respect to the Darnell allegations, "Plaintiffs' Declarations . . . describe objectively appalling and alarming conditions of confinement in Central Booking, to which the City has shown deliberate indifference since at least 2010." Id. at 6 (citation omitted).  In relation to Defendants' position as to the exercise of discretion with respect to the COVID-19 allegations and the Darnell allegations, Plaintiffs argue (1) that the NYSCC Memorandum, as to the former, and the City Regulation, as the latter, govern and "do not, on their face, permit for [sic] lack of enforcement at the commanding officer's discretion," and (2) that Ms. Jones and Mr. Strebel "have testified that they ultimately are responsible for ensuring compliance with centralized 'guidelines' and safety protocols for the conditions in Central Booking" but have failed to do so,

such that <u>Wal-Mart</u> is distinguishable. <u>Id.</u> at 6-7 (citations omitted). Plaintiffs argue that this centralized control and responsibility for the City's centralized booking facilities distinguish this case from <u>Wal-Mart</u>. Plaintiffs note that Defendants' own argument is internally inconsistent, in that Defendants claim that "they have followed all applicable guidance throughout the class period." <u>Id.</u> at 7 (citation & quotations omitted). According to Plaintiffs, this "does not square with Defendants' 'discretion' argument and is otherwise unsupported by the record, as Plaintiffs' numerous Declarations show systemic failures to follow CDC Covid-19 Protocols and unconstitutional conditions of confinement." <u>Id.</u> at 7-8.

### b.    Legal Standard

#### 1.    Commonality

The commonality requirement necessitates that "the plaintiff . . . demonstrate that the class members have suffered the same injury," but the claims for relief of the putative class members "need not be identical for them to be common." <u>Barrows v. Becerra</u>, 24 F.4th 116, 130-31 (2d Cir. 2022) (citations & quotations omitted) (noting that, while "all class members claim to have suffered the same injury," namely that "they were denied Medicare Part A coverage that they were entitled to because they were unable to challenge their reclassifications from inpatients to outpatients receiving observation services[,] . . . some class members were harmed because their hospital costs were not reimbursed, while others were harmed because their post-hospitalization SNF care was not covered," but "[t]hat the injury arising from the absence of an appeals process may manifest itself differently depending on a beneficiary's medical situation does not defeat the commonality of the class's injury"); <u>see Sykes v. Mel S. Harris  Assocs. LLC</u>, 780 F.3d 70, 80 (2d Cir. 2015) (stating that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and not "merely that they

have all suffered a violation of the same provision of law" (citation & quotations omitted)).

Further, "[w]hat matters to class certification is not the raising of common questions . . . but

rather, the capacity of a class-wide proceeding to generate common <u>answers</u> apt to drive the

resolution of the litigation" such that "there [are] . . . issues whose resolution will affect all or a

significant number of the putative class members."  <u>Barrows</u>, 24 F.4th at 131 (citations &

quotations omitted).  In sum, "[w]here the same conduct or practice by the same defendant gives

rise to the same kind of claims from all class members, there is a common question."  <u>Id.</u>

(citation & quotations omitted); <u>see</u> <u>Sykes</u>, 780 F.3d at 80 (reasoning that the commonality prong

requires a "common contention" that is "of such a nature that it is capable of classwide resolution

– which means that determination of its truth or falsity will resolve <u>an issue</u> that is central to the

validity of each one of the claims in one stroke" (citation & quotations omitted)).  Notably,

"[e]ven a single [common] question will do."  <u>Wal-Mart</u>, 564 U.S. at 359 (citations & quotations

omitted).

## 2. Plaintiffs Rely On <u>Darnell</u> As To Violations Of Constitutional Rights

In <u>Darnell v. Pineiro</u>, 849 F.3d 17 (2d Cir. 2017), the Court of Appeals for the Second

Circuit described that, at the central booking facility in Brooklyn,

> each plaintiff was allegedly subjected to one or more degrading conditions of
> confinement that purportedly constitute nine types of constitutional deprivations:
> (1) [o]vercrowding; (2) [u]nusable [t]oilets; (3) [g]arbage and [i]nadequate
> [s]anitation; (4) [i]nfestation; (5) [l]ack of toiletries and [o]ther [h]ygenic [i]tems;
> (6) [i]nadequate [n]utrition; (7) [e]xtreme [t]emperatures and [p]oor [v]entilation;
> (8) [d]eprivation of [s]leep; and (9) [c]rime and [i]ntimidation.

<u>Id.</u> at 23.  The <u>Darnell</u> Court considered, as to the claims of twenty individual plaintiffs, (1)

"whether, consistent with <u>Willey</u> [<u>Willey v. Kirkpatrick</u>, 801 F.3d 51 (2d Cir. 2015)], and the

precedents on which it is based, appalling conditions of confinement cannot rise to an objective

violation of the Fourteenth Amendment's Due Process Clause so long as the detainee is subjected to those conditions for no more than twenty-four hours, and the detainee does not suffer an actual, serious injury during that time" and (2) "whether Kingsley [Kingsley v. Hendrickson, 576 U.S. 389 (2015)] altered the standard for conditions of confinement under the Fourteenth Amendment's Due Process Clause." Id. at 21-22 (footnote omitted).

As to the former, the Second Circuit held that

[t]he District Court erroneously granted summary judgment for the defendants on the basis that no jury could find that the nine challenged conditions of confinement in this case, considered together or separately, amounted to an objective constitutional deprivation because no plaintiff could establish a regular deprivation lasting more than twenty-four hours, or an actual serious injury or sickness."

Id. at 36-37. As to the latter, the Second Circuit answered the question in the affirmative, holding that "[a] pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions," which requires proof satisfying two prongs: "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' – perhaps better classified as a 'mens rea prong' or 'mental element prong' – showing that the officer acted with at least deliberate indifference to the challenged conditions." Id. at 29-30 (citation omitted). As to the first prong, the Second Circuit explained that "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," with the combination of conditions to be considered "where one alleged deprivation has a bearing on another," such as "[a]n overcrowded cell . . . exacerbat[ing] the effect of unsanitary conditions" "poor ventilation . . . be[ing] particularly harmful when combined with an overflowing toilet" or "[i]nadequate nutrition . . . be[ing] compounded by infestation." Id. at 30,

32 (citations & quotations omitted).  In either event, the conditions are to be measured by "severity and duration."  Id. at 32.  As to the second prong, the Second Circuit noted that

> [t]he reason that the term 'subjective prong' might be a misleading description is that . . . the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known).

Id. at 29 (citation omitted).  The Second Circuit adopted the objective standard, holding that a pretrial detainee may prove the second prong by showing "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  Id. at 35.

### c.    Application

The putative class satisfies the commonality requirement.

Plaintiffs contend that the putative class suffered "unconstitutional conditions of confinement" due to Defendants' failure to comply with the NYSCC Memorandum, as required in relation to Plaintiffs' COVID-19 allegations, and the City Regulation, as required in relation to Plaintiffs' Darnell allegations.  See ECF No. 104 at 6 (citation omitted).

### 1.    NYSCC Memorandum Compliance

The NYSCC Memorandum refers to the CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (the "CDC Guidance"),[12] which

---

[12] Plaintiffs have not submitted a copy of the CDC Guidance to the Court.  Nonetheless, pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the CDC Guidance, which was issued on March 27, 2020, and was in effect at the time of issuance of the NYSCC

contains recommendations on several topics relevant to institutions, including: enhanced cleaning/disinfecting and hygiene practices; social distancing strategies; infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages; screening of incoming incarcerated individuals; staff and visitors; and evaluation, quarantine, and clinical care of confirmed and suspected cases of COVID-19.

ECF No. 102-47 at 2. The CDC Guidance, among other things, includes the following guidelines: (1) "[e]nsure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases," with "[m]edical isolation and quarantine locations . . . separate" and with "contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously," Centers for Disease Control & Prevention (U.S.), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities, CDC Stacks (Mar. 27, 2020), https://stacks.cdc.gov/view/cdc/86821, at 6; (2) "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available," including standard medical supplies, tissues, liquid soap or, alternatively, bar soap, hand-drying supplies, alcohol-based hand sanitizer where permitted, cleaning supplies, face masks, N95 respirators, eye protection, gloves, gowns, and sterile supplies, id. at 7-8; (3) "implement[] intensified cleaning and disinfecting procedures," including (a) "clean[ing] and disinfect[ing] surfaces and objects that are frequently

---

Memorandum on April 4, 2020. See Centers for Disease Control & Prevention (U.S.), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities, CDC Stacks (Mar. 27, 2020), https://stacks.cdc.gov/view/cdc/86821. The Court notes that updated versions of the CDC Guidance were issued on July 14, 2020, July 22, 2020, December 31, 2020, June 9, 2021, February 10, 2022, and February 15, 2022. The Court refers to the original version of the CDC Guidance for purposes of its analysis, as the NYSCC Memorandum incorporated the original version.

touched, especially in common areas," which encompasses "doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones," several times daily, id. at 9; (4) "[r]einforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility," id. at 10; (5) "[e]ncourage all persons in the facility to . . . [p]ractice good hand hygiene" by "[r]egularly wash[ing] . . . hands with soap and water for at least 20 seconds," id.; (6) "[p]erform pre-intake screening and temperature checks for all new entrants," id.; (7) for individuals with COVID-19 symptoms, (a) "[r]equire the individual to wear a face mask" and ensure that staff who have been in direct contact with the individual wear appropriate PPE, (b) "[p]lace the individual under medical isolation" and (c) refer the individual to healthcare staff or, for "[f]acilities without onsite healthcare staff," contact the "health department to coordinate effective medical isolation and necessary medical care," id.; and (8) "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)," id. at 11. The NYSCC Memorandum instructs the recipients, who are the "sheriffs, commissioners of correction, jail administrators, wardens, jail physicians, facility medical directors, chiefs of police, and SSD facility directors," to "immediately review this information with your respective administration and local health officials[;] . . . make any necessary adjustments to your policies, procedures and operations[;] . . . [and] take all available precautions to minimize the risk of a COVID-19 outbreak." ECF No. 102-47 at 2 (capitalization altered).

Plaintiffs' declarations recount various conditions that failed to comport with the NYSCC Memorandum. See ECF Nos. 102-1 to 102-40, 102-42 to 102-45 & 102-50-102-52. Despite Defendants' contentions to the contrary, Plaintiffs' core complaints are highly uniform. In

purported violation of the NYSCC Memorandum and, by extension the CDC Guidance, Plaintiffs complain of (1) exposure to other detainees within the same cell experiencing symptoms of COVID-19, in contravention of guidelines 1 and 7 of the CDC Guidance; (2) lack of access to soap and water or hand sanitizer, in contravention of guidelines 2, 4 and 5 of the CDC Guidance; (3) failure of staff to clean holding cells, leading to, among other things, filthy and unusable toilets and sinks, in contravention of guideline 3 of the CDC Guidance; (4) failure to perform pre-intake COVID-19 screenings and temperature checks, in contravention of guideline 6 of the CDC Guidance; and (5) inability to socially distance, in contravention of guideline 8 of the CDC Guidance.  See ECF Nos. 102-1 to 102-40, 102-42 to 102-45 & 102-50-102-52.

## 2. City Regulation Compliance

The City Regulation, entitled "Sanitation and Maintenance," provides as follows:

(a) Definite arrangements shall be made so that janitorial and maintenance services are regularly provided to insure that satisfactory conditions will exist at all times.
(b) If bedding items such as sheets and pillow cases are used, they shall be changed each time a prisoner is released.
(c) Mattresses if used in cells or detention rooms should preferably be of a soil and water-resistant type and their condition should be checked regularly for damage, attempts to conceal contraband items, etc.
(d) When an approved type wood bunk is in use, mattresses, sheets and pillowcases are not required in routine operations.
(e) A supply of clean blankets shall be kept available for issue depending on such circumstances as the condition of the prisoner, and the temperature in the detention area.  Blankets shall not be routinely left in the cells, and shall be laundered or sterilized as necessary to ensure proper cleanliness.
(f) A supply of soap, paper towels and toilet tissue shall be maintained, and paper drinking cups made available when lavatories do not have an integral drinking fount.  Supplies of this nature should be issued as needed and not routinely left in cells.
(g) In addition to the items listed in subdivision (f) of this section, tampons and sanitary napkins shall be made available to all female prisoners at facility expense.  Facilities shall maintain a sufficient supply of tampons and sanitary napkins, which shall be stored, dispensed and disposed of in a sanitary manner.

(h) Locks on cell doors and security doors, locking devices and the security aspects of detention type windows and screens shall be checked regularly to insure that they are in proper condition.

9 NYCRR § 7506.1.

Plaintiffs' declarations recount various conditions that failed to comport with the City Regulation.  See ECF Nos. 102-1 to 102-40, 102-42 to 102-45 & 102-50-102-52.  Despite Defendants' contentions as to violations of the City Regulation to the contrary, Plaintiffs' core complaints are highly uniform.  In purported violation of the City Regulation, Plaintiffs complain of (1) the failure of staff to clean holding cells, leading to, among other things, bad odors, the presence of garbage throughout the cells, filthy and unusable toilets and sinks, the presence of urine and feces, infestations and general dirty conditions, in contravention of 9 NYCRR § 7506.1(a); (2) the failure to make available mattresses, sheets and pillowcases, in spite of the absence of approved wood bunks, in contravention of 9 NYCRR § 7506.1(d); (3) the failure to make available blankets, in contravention of 9 NYCRR § 7506.1(e); and (4) the failure to make available soap and toilet tissue, in contravention of 9 NYCRR § 7506.1(f).  See ECF Nos. 102-1 to 102-40, 102-42 to 102-45 & 102-50-102-52.

Defendants' argument that the limited factual variabilities set forth in Plaintiffs' declarations defeat commonality is unpersuasive.  The Court finds that, on examination, Defendants' alleged regular deviations from the NYSCC Memorandum and the City Regulation, as set forth above and as described in the 46 declarations of Plaintiffs, would present common questions of law and fact and would lead to common answers, sufficient to satisfy the commonality requirement.

### 3.    Analysis Of <u>Wal-Mart</u> In This Case

The Court is unpersuaded by Defendants' primary argument that this case is akin to <u>Wal-Mart</u>, such that the allegedly diffuse exercise of discretion by Defendants militates against finding that the commonality requirement is satisfied.  The Supreme Court in <u>Wal-Mart</u> rested its decision on the absence of a defendant company-wide policy under which local managers exercised their discretion over employment matters in a discriminatory manner:

> The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal–Mart's "policy" of allowing discretion by local supervisors over employment matters.  On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; <u>it is a policy against having uniform employment practices</u>.  It is also a very common and presumptively reasonable way of doing business—one that we have said should itself raise no inference of discriminatory conduct.

<u>Wal-Mart</u>, 564 U.S. at 355 (emphasis added) (citation & quotations omitted); <u>see, e.g.</u>, <u>id.</u> at 343 (stating that "[p]ay and promotion decisions at Wal-Mart are generally committed to local managers' broad discretion, which is exercised in a largely subjective manner" (citation & quotations omitted)); <u>id.</u> at 356 (noting that "[r]espondents have not identified a common mode of exercising discretion that pervades the entire company – aside from their reliance on Dr. Bielby's social frameworks analysis that we have rejected" and reasoning that, "[i]n a company of Wal-Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction").

This case can be meaningfully distinguished from <u>Wal-Mart</u> in a dispositive respect.  In <u>Wal-Mart</u>, the putative class could not satisfy the commonality requirement due to the widespread, non-uniform exercise of local managers' discretion throughout its operation.  In this case, Plaintiffs offer testimony to support their argument that the conditions in the City's central booking facilities were the responsibility of the commanding officer of the NYPD's Criminal

Justice Bureau, with the person in that position, as well as his or her subordinates, required to act in accordance with the above-identified applicable policies; they were not authorized to exercise discretion. See, e.g., ECF No. 105 at 15-16, Tr. 126:12-16, 207:14-208:2 (Mr. Strebel responding, when asked whether, as commanding officer of the NYPD's Criminal Justice Bureau, "it was one of your responsibilities to ensure that the conditions of confinement in Central Booking were adequate and in compliance with the law[,] . . . [i]t was my responsibility ultimately - - and I had a structure under me of ranking bosses and supervisors that were tasked with doing that" and that "I communicated with subordinates, I had staff meetings, and if anything was systemic, as you said, I would have expected it would have been brought to my attention, and it wasn't"); id. at 20, 29, Tr. 10:5-19, Tr. 153:2-21 (Ms. Jones stating that, as commanding officer of the NYPD's Criminal Justice Bureau, she was "ultimately responsible" to "ensur[e] humane and lawful conditions of confinement in Brooklyn Central Booking" and describing that she "ensured that it was a safe working environment - - I had police officers assigned there, I had PAs assigned there, I had staff, I would go in and out; so I made sure that the conditions were clean, that the temperature was moderated, it wasn't too hot, it wasn't too cold, simply because that was the thing to do and that's what our - - department guidelines mandates that we do," that "I followed those procedures to ensure that; [sic] that the prisoners were kept in a clean environment, my officers worked in a clean environment," and that "my job was to ensure that, and to address any issues that would impact upon that not being the case," as "it was what the department mandated that I do").

The Court notes that courts within this Circuit have certified classes of detainees at multiple prison facilities under the Wal-Mart standard. See, e.g., West v. Gobeille, 450 F. Supp. 3d 497, 503-04, 511 (D. Vt. 2020) (considering a motion to certify a class "of inmates and

detainees in the custody of the Vermont Department of Corrections (DOC)[13] who have been diagnosed with chronic HCV," in relation to allegations "that Defendants are denying or withholding curative HCV medications from Vermont inmates without medical justification in order to avoid the associated costs," and holding the commonality prerequisite to be satisfied, in view of the following common questions: (1) assessing "whether persons in DOC custody are being treated according to the standard of care," (2) "identifying the precise boundaries of Defendants' policy or practice" and (3) "determining whether that policy or practice constitutes deliberate indifference to a serious medical need" (citations omitted)); Barfield v. Cook, No. 3:18 Civ. 1198 (MPS), 2019 WL 3562021, at *2-4, *9-10 (D. Conn. Aug. 6, 2019) (considering a motion for class certification, defining the class as "[a]ll sentenced persons (1) who have or will be diagnosed with chronic Hepatitis C; (2) who are or will be in the custody of the Connecticut Department of Corrections; and (3) who have at least sixteen weeks remaining to serve on their sentences," referring to multiple facilities at which the named plaintiffs were detained, and holding that the commonality prerequisite was satisfied, in view of "[t]he following common questions . . . central to the validity of the class claims: (1) whether the standard of care requires immediate treatment with DAAs [(direct-acting antiviral drugs)] for all individuals with chronic HCV; (2) whether individuals with chronic HCV will suffer from serious medical issues if treatment is delayed or denied; (3) whether the G 2.04 Policy [(the 'policy governing the treatment of prisoners with HCV')] was consistent with the standard of care; (4) whether the Defendant's practices were consistent with the standard of care; (5) whether Defendant, in

---

[13] The Court takes judicial notice, pursuant to Federal Rule of Evidence 201, of the fact that the Vermont Department of Corrections is comprised of six correctional facilities. See State of Vermont, Correctional Facilities, https://doc.vermont.gov/correctional-facilities (last visited Aug. 2, 2023).

practice, delayed treatment for virtually all patients with chronic HCV; (6) whether Defendant erected burdensome procedures to access treatment for chronic HCV; and (7) whether the Defendant's actions constitute deliberate indifference to a serious medical need" (citations & quotations omitted)); Parker v. City of New York, No. 15 Civ. 6733 (CLP), 2017 WL 6375736, at *1-3, *9 (E.D.N.Y. Dec. 11, 2017) (considering a motion for conditional certification of a settlement class of "the named plaintiffs and all people who were confined in PSEG [solitary confinement or punitive segregation] while a pretrial detainee based on the Old Time Policy at any time between November 23, 2012 and September 16, 2015," requiring that notice to class members be posted "in NYDOC facilities . . . in places where individuals are likely to see them" within 45 days of preliminary approval of the class settlement and holding that the commonality prerequisite was satisfied, in view of the "common legal questions," namely "whether the Old Time Policy was imposed for or had the effect of imposing punishment, whether the policy had a legitimate governmental purpose, whether the pretrial detainees had a liberty interest in avoiding solitary confinement, and what process was due to the detainees before the policy was imposed upon them," as well as "the related operative facts" (citations omitted)); see also Butler v. Suffolk Cnty., 289 F.R.D. 80, 98 (E.D.N.Y. 2013) (concluding (1) that, as to the second, "deliberate indifference" prong of a § 1983 claim under Darnell, "[w]hether the County was aware of and deliberately indifferent to the conditions at the SCCF[, which is comprised of two facilities,] is a common question subject to class-wide resolution" and (2) that, as to the first, "objective deprivation" prong of a § 1983 claim under Darnell, "although the conditions in the two facilities are alleged to be similar, a determination that the conditions at Riverhead are objectively, sufficiently serious enough to deny the Riverhead inmates the minimal civilized measure of life's necessities does not answer the question of whether the conditions at Yaphank

were unconstitutionally inhumane and vice versa," and therefore holding "that the Injunctive and Damages classes must be divided into subclasses – one for each facility – so that the actual nature of the conditions at Riverhead and Yaphank and whether those conditions fall below constitutionally acceptable standards will be subject to (sub)class-wide resolution" [14] (citations, quotations & footnote omitted)).

### iii. Typicality

The Court describes the positions of the parties then discusses and applies the legal standard for the typicality prerequisite.

### a. Positions Of The Parties

Plaintiffs contend that their "claims are typical of the [putative] Class that they seek to represent," as

> [e]ach member . . . (1) is an individual who is or has been detained at a Central Booking facility; (2) has suffered unsanitary, crowded, and poorly ventilated conditions without access to face masks, hand sanitizer or soap; (3) subjected [sic] to unconstitutional conditions of confinement at issue in Darnell; and [sic] (4) faced or faces a substantial risk to their future health.

---

[14] The Court here need not follow the Butler process of establishing sub-classes at this stage, where the analysis of the "objective deprivation" prong is twofold: (1) as applied here, given the unified oversight over the City's five central booking facilities, the responsible official's acts, or failures to act, resulted in largely consistent conditions across the five facilities, see ECF Nos. 102-1 to 102-40, 102-42 to 102-45 & 102-50-102-52, and, (2) even if the analysis of the "objective deprivation" prong was not a common question in Butler, given the Butler Court's finding that the analysis of the "deliberate indifference" prong was a common question and that a single common question satisfies the commonality prerequisite, see Wal-Mart, 564 U.S. at 359 (citations), division into subclasses was not mandatory. Further, at this juncture, Plaintiffs and Defendants have neither raised nor briefed this issue. See generally ECF Nos. 101, 103 & 104. Nonetheless, the authority of district courts "to implement management strategies tailored to the particularities of each case," which includes the authority to "certify subclasses that separate class members into smaller, more homogenous groups defined by common legal or factual questions[,] . . . need not necessarily be exercised or even planned for prior to class certification." In re Petrobas Secs., 862 F.3d 250, 274 (2d Cir. 2017) (citations & footnote omitted).

ECF No. 101 at 22. Plaintiffs' claims and the claims of the putative class more generally "arise from the same failure of Defendants to implement adequate public health measures in response to Covid-19 in accordance with standard CDC protocol and to correct the conditions at issue in Darnell." Id.

Defendants' arguments as to the typicality requirement are discussed in conjunction with their arguments as to the commonality requirement in their briefing and, accordingly, above. See supra, Sec. II(A)(ii).

In reply, Plaintiffs argue that "[s]light variations in Plaintiffs' recollections of the conditions they suffered in Central Booking do not defeat typicality." See ECF No. 104 at 9.

### b. Legal Standard

The typicality requirement necessitates "that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Barrows, 24 F.4th at 131 (citation & quotations omitted) (rejecting the argument "that because the named plaintiffs were previously hospitalized, they are not typical of the class members who are going to be hospitalized and who therefore have a stronger interest in the expedited appeals process for currently-hospitalized individuals" because, among other things, the claims of the named plaintiffs "are still typical of those of future hospital patients because they arise from the same conduct" (citation omitted)). The commonality and typicality prerequisites "of Rule 23(a) tend to merge," as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the plaintiff's claim and the class claims are so interrelated that the interests of the class

members will be fairly and adequately protected in their absence."  Wal-Mart, 564 U.S. at 349 n.5.

### c.      Application

The putative class satisfies the typicality requirement.

The legal bases for Plaintiffs' claims are the Due Process Clause of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, the New York State Constitution and New York common law.  See generally ECF No. 79.  The factual bases for Plaintiffs' claims are highly uniform, as evidenced by Plaintiffs' declarations describing the COVID-19-related and continuing Darnell-like problems with the conditions of confinement at the City's five central booking facilities from February 3, 2020 forward, discussed supra, Sec. II(A)(ii)(c).  In view of the consistent legal and factual bases of Plaintiffs' claims, and in view of the definition of the putative class, namely "[a]ll pre-arraignment detainees in City of New York's Central Booking facilities from February 3, 2020 to the present," ECF No. 101 at 10, the Court finds that Plaintiffs' claims are typical of those of the putative class.

### iv.      Fair And Adequate Representation

The Court describes the positions of the parties then discusses and applies the legal standard for the fair and adequate representation prerequisite.

### a.      Positions Of The Parties

Plaintiffs contend that their declarations and those of the putative class members "demonstrate there is no conflict of interest between Plaintiffs and the Class of detainees they seek to represent."  ECF No. 101 at 23.

Defendants do not dispute that the putative class satisfies the requirement of fair and adequate representation.  See generally ECF No. 103.

Plaintiffs therefore do not address the fair and adequate representation requirement in their reply.  See generally ECF No. 104.

### b.    Legal Standard

Because the maintenance of a class action is "an exception to the general rule that one is not bound by a judgment in a suit in which he or she is not a named party," due process requires that "a class representative . . . be part of the class and possess the same interest and suffer the same injury as the class members," such that the representative "at all times adequately represent[s] the interests of the absent class members."  Irvin v. Harris, 944 F.3d 63, 70-71 (2d Cir. 2019) (citations & quotations omitted).  Adequacy of representation generally amounts to two factors: "(1) absence of a conflict and (2) assurance of vigorous prosecution."  Id. at 71 (citation & quotations omitted).

### c.    Application

The putative class satisfies the adequate and fair representation requirement.

Plaintiffs have no apparent conflict with the putative class, see ECF No. 101 at 23, and neither Plaintiffs nor Defendants has presented any information that would cause the Court to doubt that Plaintiffs are prepared to vigorously prosecute the action on behalf of the interests of the putative class.

**B.    Whether The Putative Class Qualifies As A Class Type Pursuant To Federal Rule Of Civil Procedure 23(B)(2), (3) Or, Alternatively, Warrants Class Certification As To Particular Issues Pursuant To Federal Rule Of Civil Procedure 23(C)(4)**

### i.    Injunctive Or Declaratory Class Pursuant To Federal Rule Of Civil Procedure 23(b)(2)

Federal Rule of Civil Procedure 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if: . . . (2) the party opposing the class has acted or

26

refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

### a. Positions Of The Parties

Plaintiffs contend "that they and the other members of the Class were and continue to be subjected to Defendants' unconstitutional practices and policies of failing to follow the CDC's Covid-19 protocols for detainees and the conditions of confinement at issue in Darnell," which "allegations are archetypal of classes that have been certified under Rule 23(b)(2)." ECF No. 101 at 29 (citations omitted).

Defendants counter with two arguments. First, Defendants argue that "Plaintiffs have wholly failed to satisfy their burden to establish standing to seek prospective relief," as Plaintiffs have not alleged the likelihood of being "detained in Central Booking once again and, while detained, experienc[ing] the same or similar conditions, including but not limited to contracting COVID-19 while in NYPD custody." ECF No. 103 at 29, 31. Second, Defendants argue that "Plaintiffs have failed to demonstrate that all class members stand to benefit from the requested injunction, as is required to demonstrate that the relief sought is indivisible," given that "Plaintiffs have not alleged that a single named Plaintiff, let alone every member of the class, is likely to be detained or face the alleged conditions again[,] . . . [n]or have they explained how they stand to benefit from the relief sought in the event that they are not subsequently detained in one of the facilities at issue." Id. at 31-32.

In reply, Plaintiffs argue that "[t]he unconstitutional conditions of confinement in the Central Booking facilities set forth in Plaintiffs' Declarations have existed, in large part, since at least 2010" and "are recurring and have evaded meaningful review." ECF No. 104 at 11-12 (citations omitted). Plaintiffs also note that "[s]everal" of them "have been detained in Central

Booking more than once during the Class Period." Id. at 12 (citations omitted).

**b.     Legal Standard**

As to the issue of standing, "standing is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." Hyland v. Navient Corp., 48 F.4th 110, 117 (2d Cir. 2022) (citations omitted).  While,

> [n]ormally[,] a class action would be moot if no named class representative with an unexpired claim remained at the time of class certification[,] . . . pretrial custody [is] . . . inherently temporary and of uncertain nature, such that [a court cannot] . . . determine that any given individual, named as a plaintiff, would be in pretrial custody long enough for a district judge to certify the class.  At the same time, . . . there would always be some group of detainees subject to the challenged practice.

U.S. v. Sanchez-Gomez, 138 S. Ct. 1532, 1538 (2018) (citations & quotations omitted).  Under such circumstances, a class action may proceed.  See id. (citations omitted).

Certification under Federal Rule of Civil Procedure 23(b)(2) requires that "a defendant . . . acted on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Barrows, 24 F.4th 116, 132 (citation & quotations omitted).  By contrast, "a class cannot be certified when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." Id. (citation & quotations omitted).  This rule "does not require that the relief to each member of the class be identical, only that it be beneficial," such "that different class members can benefit differently from an injunction." Id. (citations & quotations omitted) (holding that "[t]hat the injunction includes both a mechanism for retroactive review and prospective review does not make the class unsuitable for relief under Rule 23(b)(2)" (citation omitted)).

c.  **Application**

The putative class satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2).

As to the standing issue, that Plaintiffs are not currently being held in pre-arraignment detention does not moot the putative class action, as pre-arraignment detention is necessarily and inherently transitory.  As to the substantive requirements, for Plaintiffs, the standing analysis subsumes the inquiry as to whether they will benefit from the injunction sought, as Plaintiffs are not currently detained, and, for the putative class, any members who are currently detained will certainly benefit from any injunction obtained.[15]  See ECF No. 104 at 12 (arguing that the "conditions are recurring and have evaded meaningful review," noting that "[s]everal Plaintiffs . . . have been detained in Central Booking more than once during the Class Period" and arguing that "Plaintiffs' interests, and those of the members of the Class who may be detained in Central Booking in the future, are sufficiently aligned" due to "the likelihood of recurring harm to Plaintiffs and the other members of the Class" (citations omitted)).

ii.  **Predomination Of Common Questions And Superiority Of Class Action Pursuant To Federal Rule of Civil Procedure 23(b)(3)**

Federal Rule of Civil Procedure 23(b)(3) provides:

A class action may be maintained if Rule 23(a) is satisfied and if:

---

[15] A factual question to be developed is whether the COVID-19-related practices for which Plaintiffs advocate are still best practices or covered by CDC or New York State guidance, as the national COVID-19 emergency has ended.  National Emergencies Act, Pub. L. No. 118-3, 137 Stat. 6 (2023).  On the record before the Court, COVID-19 prevention practices were still necessary in the City's central booking facilities.  See, e.g., ECF No. 101 at 7 (stating that "Defendants subjected Plaintiffs and the Class to unconstitutional conditions of confinement by failing to provide pre-arraignment detainees in the City's Central Booking facilities with any protections from contracting Covid-19 during their confinement and allowing appalling jail conditions that provide a breeding ground for Covid-19"); ECF No. 103 at 14 (stating that "Defendants have followed all applicable guidance throughout the class period," including "cell cleaning, KN95 mask provision, hand sanitization, and health screening" (citations omitted)).  COVID-19 infections in New York City have recently been rising, suggesting a continuing need for infection control.

* * *

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

### a.    Predominance

### 1.    Positions Of The Parties

Plaintiffs contend that, "[s]ince February 2020, Defendants have subjected Plaintiffs and the Class to inhumane conditions of confinement when they were pre-arraignment detainees in the Central Booking facilities" and that, "[t]o the extent some Plaintiffs may have suffered unique injuries from their experiences in the Central Booking facilities, these issues will not predominate over the common issues relevant to all Plaintiffs." ECF No. 101 at 25-26. Plaintiffs further note that any individualized issues as to damages may be addressed through the "management tools available to a district court . . . , including trial bifurcation, assignment to a magistrate judge or special master for damages calculations, or decertification and notice after a liability determination." Id. at 26 (citation & quotations omitted).

Defendants counter that "Plaintiffs have not averred sufficient evidence to establish that the few common issues amongst the class members predominate over the litany of individualized issues implicated in this action." ECF No. 103 at 21 (citation omitted). More specifically, Defendants argue (1) that "Plaintiffs do not allege that any single action by the Defendants constituted a deprivation of their Due Process rights"; (2) that "[t]he individualized nature of the

Plaintiffs' allegations, alongside their broad class definition, foreclose the possibility that members of the class could establish liability with the same evidence or that their claims are susceptible to generalized class-wide proof" and, along those lines, that "Plaintiffs make no meaningful attempt to explain how they can establish on a class-wide basis any of the three core questions raised by their claims: (1) what combination of conditions a given detainee experienced; (2) whether said conditions amount to an objective depravation [sic]; and (3) whether Defendants subjected the detainee engaged in said conduct with at least deliberate indifference; and (3) that "[t]he common issues raised by Plaintiffs' claims are few and far between." Id. at 22-24, 27 (citations & quotations omitted). As to the damages inquiry, Defendants posit, as to the COVID-19 allegations, that "[e]ach particular damages inquiry will be unique, requiring the Court to analyze medical records and expert opinions about the connection between each alleged medical condition and COVID-19 infection and that "not a single named Plaintiff alleges that that [sic] they actually were infected with COVID-19," id. at 26, n.5, and, as to the Darnell allegations, that "[a] damages class would be radically inefficient because each Plaintiff will have to prove each of their individual conditions," id. at 9.

In reply, Plaintiffs argue that, "[u]ltimately, whether the City has failed to comply with the written protocols for safety and hygiene, whether the conditions of confinement posed a substantial risk of serious harm to detainees, and whether Defendants have been deliberately indifferent to that risk, present common questions which predominate over any individualized issues of damages." ECF No. 104 at 11. In spite of the potential for individualized damages inquiries, Plaintiffs additionally advocate for the use of "a common model of damages linked to their theory of liability which would provide general damages on a per-diem basis, at a rate set by the fact-finder and not based on any individual characteristics of class members." Id. (citation

& quotations omitted).  In sum, Plaintiffs argue that "differences in class members' damages do not defeat the predominance of common issues, especially where there is a common policy, pattern and practice that harms all class members."  Id. at 9 (citations omitted).

### 2. Legal Standard

#### (a) Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 225, 227, 230 (2d Cir. 2006) (citation & quotations omitted) ("Nassau County I") (holding "that the [d]istrict [c]ourt erred by failing to certify a class on the issue of liability," as, among other things, (1) "a concession does not eliminate a common issue from the predominance calculus" and as (2) "the [d]istrict [c]ourt erred by holding that individual issues predominated over common ones" because of "the pervasive character of the common liability issues and the admittedly de minimis nature of the individualized liability issues" (footnote omitted)).  Plaintiffs must "show that common questions predominate"; as "[i]ndividual questions need not be absent," given that "[t]he text of Rule 23(b)(3) itself contemplates that such individual questions will be present[,] . . . [t]he rule requires only that those questions not predominate over the common questions affecting the class as a whole."  Sykes, 780 F.3d at 81 (citations & quotations omitted).  Common questions also "may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."  Id. (citations & quotations omitted).

#### (b) Nassau County Cases

In Nassau County I, the Second Circuit reviewed the District Court's denial of the plaintiffs' multiple motions for certification of a putative class of members arrested for

misdemeanors and non-criminal offenses who were strip searched pursuant to a blanket policy of doing so at the Nassau County Correctional Center. Nassau Cnty., 461 F.3d at 222-24. The Second Circuit held, inter alia, that, "[i]n light of the pervasive character of the common liability issues and the admittedly de minimis nature of individualized liability issues, . . . the District Court erred by holding that individual liability issues predominated over common ones." Id. at 230. As such, the Second Circuit directed the District Court

> to certify a class on the issue of liability . . . [and] to consider anew whether to certify a class as to damages as well[,] . . . bear[ing] in mind that [t]here are a number of management tools available to a district court to address any individualized damages issues, such as bifurcation, the use of a magistrate [judge] or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability.

Id. at 231 (citation & quotations omitted).

The District Court, following the instructions of the Second Circuit on remand, then certified the putative class for purposes of liability, see generally O'Day v. Nassau Cnty., No. 99 Civ. 2844 (DRH) (AYS) (E.D.N.Y. Jan. 16, 2007), ECF No. 122, vacated in part on other grounds, No. 99 Civ. 2844 (DRH) (AYS) (E.D.N.Y. July 18, 2013), ECF No. 440 at 27, and considered "Plaintiffs' application to certify the class as to Plaintiffs' entire claims, i.e., to extend class certification to include damages," holding "that extending class certification to the entire claim is appropriate because[, inter alia,] questions common to class members predominate over any questions affecting only individual members." In re Nassau Cnty. Strip Search Cases, Nos. 99 Civ. 2844 (DRH), 99 Civ. 3126 (DRH), & 99 Civ. 4238 (DRH), 2008 WL 850268, at *1 (E.D.N.Y. Mar. 27, 2008). In reaching this conclusion, as to the predominance requirement, the District Court reasoned that, "[h]ere, class members were aggrieved by a single, admittedly unlawful policy and there is strong commonality between the strip search violation and the harm," leaving "no reason that a jury in this case, hearing the procedures used by Defendants for

strip searches together with the testimony of a number of class members as to the circumstance of the actual searches, could not determine an amount of general damages awardable to each member of the class," with "care . . . be[ing] taken to ensure that the amount awarded for general damages excludes all elements of special damages that individual class member[s] might then pursue." Id. at *6. The District Court then certified the class for purposes of damages as well, see generally O'Day v. Nassau Cnty., No. 99 Civ. 2844 (E.D.N.Y. May 1, 2008), ECF No. 130, leave to appeal as to which was denied, see generally No. 99 Civ. 2844 (E.D.N.Y. Aug. 18, 2008), ECF No. 136.

The District Court presided over a bench trial "on the issue of general damages sustained by class members" and issued its findings of fact and conclusions of law, awarding general damages of $500 per strip search based on a theory of an affront to human dignity. See In re Nassau Cnty. Strip Search Cases, 742 F. Supp. 2d 304, 331 (E.D.N.Y. 2010).[16]

Defendants then moved to clarify that the class portion of the action had concluded, given that the liability and general damages phases of the action had concluded, or, alternatively, to decertify the class. See Augustin v. Jablonsky, 819 F. Supp. 2d 153, 156 n.1 (E.D.N.Y. 2011) (citations omitted). The District Court held that it had "not extended class certification beyond liability and general damages" and found that, as "the only claims remaining in this action are for class members' emotional distress beyond that which is inseparable from the injury to human dignity (or more severe psychological injuries), . . . questions of law or fact common to the class

---

[16] After the Supreme Court decided Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318 (2012), the District Court vacated the summary judgment order on liability for the strip searches as to the federal constitutional claims but denied the request to vacate the judgment as to the state constitutional claims. See In re Nassau Cnty. Strip Search Cases, 783 F.3d 414, 416 (2d Cir. 2015) (per curiam); see generally In re Nassau Cnty. Strip Search Cases, 639 F. App'x 746 (2d Cir. 2016). The District Court entered judgment for the plaintiffs on the state claims, which was affirmed. See generally id.

no longer predominate over questions affecting only individual class members." Id. at 163.

### (c) "Conditions Of Confinement" Class Cases Addressing Individualized Damages

Courts have considered conditions of confinement cases in which the defendants raised concerns of individualized damages and have granted certification.

While admittedly decided well before Wal-Mart, Langley v. Coughlin, 715 F. Supp. 522 (S.D.N.Y. 1989), is instructive on a predominance analysis. In Langley, the District Court considered a report and recommendation on a "class-action prisoner lawsuit . . . commenced in 1984 to seek relief from certain allegedly unconstitutional conditions and practices on the Special Housing Unit ("SHU") at the Bedford Hills Correctional Facility," namely the practice of

> routinely plac[ing] severely mentally ill inmates on SHU and . . . fail[ing] to conduct any screening of these inmates, fail[ing] to provide even marginally adequate treatment for their mental condition while they were on SHU, and fail[ing] to protect the other inmates on SHU from the conditions that resulted from the presence of these disturbed inmates – including filth, noisome odors, deafening noise, fire and smoke, and the sight and sound of prisoners engaging in such psychotic behavior as attempted suicide, self-mutilation and hallucination.

Id. at 531 (footnote omitted). Plaintiffs alleged that "these failings reflected a violation of the jailers' obligations (a) to provide medical care for the serious medical needs of the disturbed inmates and (b) to ensure that living conditions on SHU not fall below constitutionally permissible standards for all inmates on that unit." Id.

The Langley Court had initially certified a class pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) and 23(b)(2). Id. After resolution of the injunctive class claims, the Langley Court recommended recertification of the class pursuant to Federal Rule of Civil Procedure 23(b)(3) for resolution of the compensatory and punitive damages class claims. Id. at

531-32.[17]  The Langley Court concluded "that common issues of fact and law do predominate over individual issues with respect to the 'conditions of confinement' claim" and rejected defendants' argument "that damages for conditions of confinement must be based on the emotional or other injury to the individual as a result of the conditions, and that this necessitates an individualized inmate-by-inmate inquiry concerning the extent of injury resulting from any given set of unconstitutional conditions."  Id. at 557.  In doing so, the Langley Court reasoned (1) "that courts have been perfectly willing, based simply on proof of objective conditions in a prison, to award per diem damages to an inmate unconstitutionally confined," the "degree of inexactitude" for which "is entirely defensible."  See id. at 558 (citations omitted).  The Langley Court reasoned that, in the alternative, it "could establish a presumptive per diem award for each day during which conditions were of a given degree of unconstitutional severity and then permit both plaintiffs and defendants to seek a variation – either up or down – for specific class members based upon a showing of unique individual circumstances; it anticipated that "[v]ery few, if any, class members are likely to be the subject of a separate proceeding" and that, "in any event[,] separate damage proceedings are not inconsistent with class certification when the bulk of the issues, at least insofar as they concern liability, can be addressed in a single joint proceeding."  Id. at 558-59 (citations omitted).  The Langley Court also noted the availability of opt-out procedures to further ensure fairness to class members who were "more grievously injured."  Id. at 559.

The District Court adopted the report and recommendation.  See id. at 531.

In Butler v. Suffolk Cnty., 289 F.R.D. 80 (E.D.N.Y. 2013), the District Court considered

---

[17] The Court need not address the "failure to treat" subclasses discussed by the Langley Court. Id. at 552.

the plaintiffs' motion for class certification as to claims "that the men detained in the SCCF

[(Suffolk County Correctional Facility)] are forced to live in squalid, unhygienic, and hazardous

living conditions that pose a substantial and ongoing risk to the men's physical and mental

health." Id. at 86-87 (citations & quotations omitted). In addressing the predominance inquiry

pursuant to Federal Rule of Civil Procedure 23(b)(3), the Butler Court reasoned that the common

questions, namely

> (1) whether the conditions at Yaphank and/or Riverhead are cruel or inhuman in violation of the Eighth and Fourteenth Amendments; (2) whether Defendants were deliberately indifferent to the conditions at the SCCF; and (3) whether administrative remedies were unavailable, whether Defendants are estopped from raising failure to exhaust as a defense and/or whether special circumstances justify non-exhaustion[,] . . . predominate over the issues subject to individualized proof – namely the extent of each class members' damages.

Id. at 102. The Butler Court also noted that, as it had "the flexibility to deal with issues

regarding the management of this class action as they arise, the existence of individualized

questions regarding damages does not warrant denying certification of the Damages Class and

subclasses." Id. (footnote omitted). The Butler Court ultimately granted the motion for class

certification. Id. at 103.

### 3.    Application

The putative class satisfies the predominance requirement.

Plaintiffs' declarations allege largely consistent inhumane conditions of confinement

from the commencement of the proposed class period and proceeding forward and in each of the

five of the City's central booking facilities. See ECF Nos. 102-1 to 102-40, 102-42 to 102-45, &

102-50-102-52. Contrary to Defendants' contentions, determining the applicable standard of

care, the applicable standardized practices, the conditions experienced city-wide and whether

such conditions were unlawful and violated constitutional standards would be common questions

for the class.  Determining whether the conditions experienced were the result of Defendants'

deliberate indifference would be a common question, as the commanding officer of the NYPD's

Criminal Justice Bureau has been responsible for ensuring that detainees' conditions of

confinement are lawful, such that the inquiry into such officer's mental state applies to all

Plaintiffs and putative class members as to such element, in spite of Defendants' arguments

otherwise.  See, e.g., ECF No. 105 at 15-16, Tr. 126:12-16, 207:14-208:2; id. at 20, 29, Tr. 10:5-

19, Tr. 153:2-21.  Further, contrary to Defendants' position, see ECF No. 103 at 9 (arguing that

"each Plaintiff would have to prove that the particular set of governmental actors related to their

detention had the requisite mental state to support a conditions-of-confinement claim"); id. at 26

(arguing that, "[f]or any given class member to establish the mens rea element here, they must

therefore establish the mental state of the specific officials or employees responsible for the

facility within which they were detained during the specific time at which they were detained"),

inquiring as to a person's individual mental state to establish the deliberate indifference prong of

the § 1983 claims asserted here is unnecessary, as either subjective knowledge or an objective

determination of what the person should have known is sufficient, per Darnell.  See Darnell, 849

F.3d at 29 (citation omitted).

  The record is underdeveloped as to Plaintiffs' theory of causation of harm as to some of

the alleged violations.  As described above, Plaintiffs describe the constitutionally significant

conditions-of-confinement violations in two parts – subjecting Plaintiffs to conditions similar to

those identified in Darnell and COVID-19-infection control violations.  As to the former, courts

have recognized similar violations as being inhumane.  As to the latter, the injury caused is much

less certain on the current record.  In other classes based on medical issues affecting class

members, the plaintiffs complained about infection and treatment, see generally, e.g., West v.

Gobeille, 450 F. Supp. 3d 497 (D. Vt. 2020); Barfield v. Cook, No. 3:18 Civ. 1198 (MPS), 2019 WL 3562021 (D. Conn. Aug. 6, 2019), but here the focus is on prevention. As Defendants noted, no Plaintiff claims to have been infected with COVID-19 at Central Booking. As such, the Court is unclear as to whether members of the putative class intend to separately assert the harm of contracting COVID-19 from detainment or the harm of being fearful of contracting COVID-19 during detainment due to risk of exposure, or, instead, intend for any such harms to be considered holistically as one of many alleged unconstitutional conditions of confinement. See, e.g., Maney v. State, No. 6:20 Civ. 570 (SB), 2022 WL 986580, at *20 (D. Or. Apr. 1, 2022) (in discussing the predominance prong of Federal Rule of Civil Procedure 23(b)(3), noting that "[t]he injuries Plaintiffs allege here is contracting COVID-19," such that "the particular circumstances of each class member are not reflective of whether there was an injury at all, but instead reflect the extent of the injury and how much, if any, compensatory damages should be awarded to that class member as a remedy" and holding that, while "determining the amount of compensatory damages due to each class member will require individualized inquiries and is not a common question suitable for class-wide adjudication[,] . . . it is well-settled that individual questions relating to the extent of injury and amount of damages is not a proper ground for this Court to deny class certification" (citations & footnote omitted)). Despite this uncertainty but contrary to Defendant's position, questions of causation may further support predominance, in that evidence about infection rates and other epidemiological evidence may address class-wide issues such as whether the alleged failure to follow infection-control protocols leads to increased infection, or whether any infections could be traced to Central Booking in accordance with applicable scientific principles. Plaintiffs have not defined the putative class solely in relation to the COVID-19 allegations, such that the Court need not resolve these questions at this juncture.

Plaintiffs' damages theory is also less than fully developed. On the one hand, in accordance with In re Nassau Cnty. Strip Search Cases, Nos. 99 Civ. 2844 (DRH), 99 Civ. 3126 (DRH), & 99 Civ. 4238 (DRH), 2008 WL 850268 (E.D.N.Y. Mar. 27, 2008), and Langley, they advocate for the use of "a common model of damages linked to their theory of liability which would provide general damages on a per-diem basis, at a rate set by the fact-finder and not based on any individual characteristics of class members." ECF No. 104 at 11 (citation & quotations omitted). On the other hand, in accordance with Butler, they also argue that, "[u]ltimately, whether the City has failed to comply with the written protocols for safety and hygiene, whether the conditions of confinement posed a substantial risk of serious harm to detainees, and whether Defendants have been deliberately indifferent to that risk, present common questions which predominate over any individualized issues of damages." Id. (emphasis added). Whether Plaintiffs' damages theory is intended solely to encompass a per diem, general damages inquiry or is intended to encompass a per diem, general damages inquiry, in conjunction with individualized damages inquiries where appropriate, is not apparent to the Court based on the current record. Nonetheless, even if Plaintiffs intend to pursue the latter, in view of the decisions of this Circuit discussed supra, Sec. III(B)(ii)(a)(2), particularly the "conditions of confinement" cases, the Court finds that common questions predominate. Should the District Court adopt this report and recommendation, such that the putative class is certified, any future need for bifurcation, individualized damages proceedings, decertification, subclassing, or the like, if it arises, may be addressed when appropriate.

###### b.  Superiority

###### 1.  Positions Of The Parties

As to the interest in individual control, Plaintiffs contend that, "[w]hile courts generally assume that each plaintiff is entitled to his or her own day in court, [t]hat preference may be outweighed in some cases, such as where the possible recovery for each individual complainant is small relative to the cost of the litigation," which "is the case here."  ECF No. 101 at 26-27 (citation & quotations omitted).  Plaintiffs also point out that "the proposed class is composed of incarcerated or recently incarcerated people, who are likely to lack the resources or legal training to vindicate their rights."  Id. at 27 (citation & quotations omitted).  As to other pending litigation, Plaintiffs contend that they "are not aware of any pending cases involving the City's deliberate indifference to Covid-19 exposure of detainees in its Central Booking facilities during the relevant time period."  Id. at 27 (citation omitted).  As to the desirability of concentration, Plaintiffs contend that, "[s]ince BCB is where the majority of Plaintiffs and the putative Class have been detained (and where Class members will be detained in the future), as well as the other facilities in Queens and Staten Island, are located in this district [sic], it is desirable to concentrate the litigation in the Eastern District of New York."  Id. at 27.  As to manageability, Plaintiffs contend that "litigating the claims in this case on a class basis is likely to be more efficient and manageable than handling them individually," as "the predominant issues of law and fact affecting each plaintiff's claims are either similar or identical" and as, "[t]o the extent that unforeseen issues do arise, they can be addressed using normal trial management tools."  ECF No. 101 at 28 (citation & quotations omitted).

Defendants counter that "Plaintiffs have not explained how, in a system defined by discretionary decisionmaking on a facility-by-facility basis, proceeding with the proposed class

in this forum is superior to an action or actions localized in the forum where each of the plaintiffs were held." ECF No. 103 at 29. Defendants also posit that, given the array of individual issues presented in this case, as laid out above, certification of a Rule 23(b)(3) class raises serious manageability concerns that weigh against a finding of superiority." Id. (citation omitted).

In reply, Plaintiffs argue that Defendants' "argument is wholly unsupported by the record and further undermined by the testimony of the former Chiefs of the Criminal Justice Bureau of the NYPD, Jones and Strebel, who testified that the high-command for the Central Booking facilities are based at One Police Plaza, and Jones further testified that this was where the 'guidelines' for operating Central Booking are located," which must be followed. ECF No. 104 at 11 (citations omitted).

### 2. Legal Standard

Courts must determine "that class certification is the superior method for adjudicating these claims," which involves the consideration of the following four factors: "individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability." Sykes, 780 F.3d at 82 (citations omitted). The final factor, manageability, "is, by the far, the most critical concern in demonstrating whether a class action is a superior means of adjudication," which includes consideration of "when a particular forum is more geographically convenient for the parties . . . or, for example, when the defendant is located in the forum state." Id. (citations & quotations omitted).

### 3. Application

The putative class satisfies the superiority requirement.

As to the interests of the members of the putative class in controlling the prosecution of the action, Plaintiffs admittedly agree that each member's possible recovery would likely be

small, as compared to the cost of the litigation, such that pursuit of the claims as a class is appropriate. As to other litigation involving putative class members, the Court is aware of no such other litigation.[18] Concentrating the litigation in the Eastern District of New York is desirable as, of the approximately 250 individuals that are processed in the City's central booking facilities each day, approximately 185 such individuals are processed in Brooklyn, see ECF No. 101 at 19; the central booking facilities in Queens and Richmond Counties also fall within the geographical purview of the Eastern District of New York. As to manageability, the Court finds that pursuit of Plaintiffs' claims and the claims of the putative class would be more manageable through a class action than through many individual lawsuits, particularly given the limited individualized inquiries likely to arise, see Nassau Cnty., 461 F.3d at 230 (noting "little difficulty in managing a class action on the issue of liability, especially since the District Court has already noted that any individualized inquiries will be few and far between"), and the forum is appropriate geographically for the aforementioned reason.

### iii. Class Certification As To Particular Issues Pursuant To Federal Rule Of Civil Procedure 23(c)(4)

Federal Rule of Civil Procedure 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Second Circuit has construed this provision of the Rule as setting forth one of various "management

---

[18] The Court is aware of ongoing litigation in Brennan v. City of New York, 19 Civ. 2054 (NGG) (CLP) (E.D.N.Y.), and Aboubakar v. City of New York, 20 Civ. 1716 (NGG) (CLP) (E.D.N.Y.), but the putative class in those cases is defined in a manner in which the putative class members in those cases and in this case do not overlap. See Brennan v. City of New York, 19 Civ. 2054 (NGG) (CLP), ECF No. 138 at 9 (E.D.N.Y. Feb. 9, 2023) (referring to a putative class of 163,740 detainees at the City's central booking facility in Brooklyn from 2016 through 2019 (citation omitted)); Aboubakar v. City of New York, 20 Civ. 1716 (NGG) (CLP), ECF No. 100 at 9 (E.D.N.Y. Feb. 9, 2023) (referring to a putative class of 163,740 detainees at the City's central booking facility in Brooklyn from 2016 through 2019 (citation omitted)).

strategies" that district courts may implement and "tailor[] to the particularities of each case."

Petrobas, 862 F.3d at 274 (noting that, "[i]n addition to modifying class definitions and issuing class-wide rulings, district courts can, for example, bifurcate the proceedings to home in on threshold class-wide inquiries; sever claims not properly adjudicated on a class-wide basis to isolate key common issues; or certify subclasses that separate class members into smaller, more homogenous groups defined by common legal or factual questions" (citations & footnote omitted)).  The potential to implement this Rule following class certification "does not attenuate the obligation to take a 'close look' at predominance when assessing the motion for certification itself."  Id.  Here, because the Court has taken a close look at the predominance prong, as well as the full class certification analysis, and found certification to be appropriate under Federal Rule of Civil Procedure 23(b)(3), as well as Federal Rule of Civil Procedure 23(b)(2), consideration of whether certification of a liability-only class pursuant to Federal Rule of Civil Procedure 23(c)(4) is unnecessary and would be inconsistent with the Court's other recommendations herein.

### C.   Whether Putative Class Counsel May Be Appointed As Class Counsel Pursuant To Federal Rule of Civil Procedure 23(g)

#### i.   Positions Of The Parties

Plaintiffs contend that their "[c]ounsel are . . . highly-experienced in handling federal civil rights claims, and class actions in particular."  ECF No. 101 at 23-24.[19]

---

[19] Plaintiffs discuss the Federal Rule of Civil Procedure 23(g) requirement in the context of Federal Rule of Civil Procedure 23(a)(4).  See ECF No. 101 at 23-24.  Such discussion is more appropriate under Federal Rule of Civil Procedure 23(g) instead.  See Jin v. Shanghai Original, Inc., 990 F.3d 251, 263 (2d Cir. 2021) (noting that "[c]ourts recognized this and historically assessed the adequacy of class counsel under Rule 23(a)(4) even though that provision only concerns the adequacy of the class representatives," and stating that, "[w]hen Congress enacted Rule 23(g) governing the appointment of class counsel, it codified this judicial practice, taking a

Defendants do not dispute that appointment of Plaintiffs' counsel as class counsel is appropriate.  <u>See generally</u> ECF No. 103.

Plaintiffs therefore do not address the appointment of class counsel requirement in their reply.  <u>See generally</u> ECF No. 104.

### ii.    **Legal Standard**

Federal Rule of Civil Procedure 23(g) provides:

(1) Appointing Class Counsel.  Unless a statute provides otherwise, a court that certifies a class must appoint class counsel.  In appointing class counsel, the court:
    (A) must consider:
        (i) the work counsel has done in identifying or investigating potential claims in the action;
        (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
        (iii) counsel's knowledge of the applicable law; and
        (iv) the resources that counsel will commit to representing the class;
    (B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;
    (C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;
    (D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and
    (E) may make further orders in connection with the appointment.
(2) Standard for Appointing Class Counsel.  When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4).  If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.
(3) Interim Counsel.  The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.
(4) Duty of Class Counsel.  Class counsel must fairly and adequately represent the interests of the class.

---

step towards the fuller acknowledgement that it is class counsel, not the class representatives, who are truly litigating the class's claims" (citations & quotations omitted)).

### iii.	Application

The counsel proposed as class counsel meet the standard of Federal Rule of Civil Procedure 23(g).

Oren Giskan has been a practicing attorney for over 30 years.  See ECF No. 102-48 at 3. He has served as lead class counsel in six class actions resulting in settlement, five of which were in federal court and one of which was in state court.  See id.  While Mr. Giskan is not currently counsel of record in this action, two of his colleagues at the same firm are and should be able to apprise him of the procedural history and current posture of the action.  Mr. Giskan would be able to fairly and adequately represent the interests of the class.

Jason L. Solotaroff has been a practicing attorney for over 30 years.  See ECF No. 102-48 at 4.  He clerked in this District; served as a staff attorney at the Legal Aid Society, during which time he represented nine clients in criminal trials, six of whom were acquitted and one of whom was partially acquitted; then entered private practice, where he has committed a substantial portion of his practice to serving as class counsel in class actions.  See id.  Mr. Solotaroff has been counsel of record in this action since November 5, 2021, essentially since its inception.  See ECF No. 8.  Mr. Solotaroff would be able to fairly and adequately represent the interests of the class.

Catherine E. Anderson has been a practicing attorney for over 25 years.  See ECF No. 102-48 at 4.  She has served as lead or co-lead class counsel in eight class actions resulting in settlement, seven of which were in federal court and one of which was in state court.  See id. She also had previously worked on various class actions.  See id. at 5-6.  Ms. Anderson has been counsel of record in this action since November 3, 2021, since its inception.  See ECF No. 1. Ms. Anderson would be able to fairly and adequately represent the interests of the class.

Stephen Bergstein has been a practicing attorney for 30 years. See ECF No. 102-49 at 2. His focus is civil rights litigation, and he has litigated hundreds of appeals in federal and state court and has tried approximately one dozen cases to verdict, mostly in federal court. See id. at 2-3. Mr. Bergstein has been counsel of record in this action since November 5, 2021, essentially since its inception. See ECF No. 11. Mr. Bergstein would be able to fairly and adequately represent the interests of the class.

Richard Cardinale has been a practicing attorney for over 30 years. See ECF No. 102-50 at 2. He has worked at the Legal Aid Society of New York, for the Attorney General of the State of New York, for the Corporation Counsel of the City of New York, and in private practice. See id. at 2-3. Throughout his career, Mr. Cardinale has tried approximately thirty civil cases to verdict in federal court, has brought and defended against class actions, and has engaged in various appellate and criminal work. See id. at 4. Mr. Cardinale has been counsel of record in this action since November 3, 2021, since its inception. See ECF No. 7. Mr. Cardinale would be able to fairly and adequately represent the interests of the class.[20]

### D. Whether The Putative Class Is Ascertainable

### i. Positions Of The Parties

Plaintiffs contend that the putative class is ascertainable "because [m]embership is governed by the objective criteria of detention at the City's Central Booking facilities from February 2020 through the present," such that "determin[ing] whether a particular individual is a member of the class" will be "administratively feasible." ECF No. 101 at 24 (citations & quotations omitted).

---

[20] In recommending appointment of class counsel, the Court makes the decision as to whether the input of all counsel is necessary to the litigation of this case. Appointed counsel would be expected to litigate the case zealously and efficiently.

Defendants do not dispute that the putative class satisfies the ascertainability requirement. See generally ECF No. 103.

Plaintiffs therefore do not address the ascertainability requirement in their reply. See generally ECF No. 104.

### ii.    Legal Standard

The Court of Appeals for the Second Circuit has "recognized an implied requirement of ascertainability in Rule 23," which requires only that a class be defined using objective criteria that establish a membership with definite boundaries." Petrobas, 862 F.3d at 260, 264 (citation & quotations omitted). In cases concerning putative classes of detainees, including those with more amorphous criteria than those posed here, courts in this Circuit have found the ascertainablity requirement to be satisfied. See, e.g., West, 450 F. Supp. 3d at 503-04, 510 (holding that a putative class "of inmates and detainees in the custody of the Vermont Department of Corrections (DOC) who have been diagnosed with chronic HCV" was ascertainable, as "the question of custody is readily available from the DOC," the "[t]ime of incarceration is also easily determined," "[a]n HCV diagnosis may be obtained through a blood test, and there is an existing group with the DOC that has already been diagnosed," and "[t]hose under treatment, and those denied treatment, should be a matter of DOC record"); Butler, 289 F.R.D. at 101 (holding that the class was "sufficiently ascertainable to support class certification," as the "[c]lass and subclasses are defined solely by objective criteria: whether the class members are currently confined in Riverhead or Yaphank or will be confined in Riverhead or Yaphank prior to the date of judgment" (citation omitted)).

### iii.    Application

The putative class is ascertainable.

The putative class is defined as "[a]ll pre-arraignment detainees in City of New York's Central Booking facilities from February 3, 2020 to the present," ECF No. 101 at 10. As in <u>West</u> and <u>Butler</u>, this definition uses objective classification, geographic, and temporal criteria and sets a defined scope such that class membership can be readily assessed.

## III. CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the motion for class certification be granted, pursuant to both Federal Rule of Civil Procedure 23(b)(2) and Federal Rule of Civil Procedure 23(b)(3), for the class of "[a]ll pre-arraignment detainees in City of New York's Central Booking facilities from February 3, 2020 to the present," ECF No. 101 at 10, and that proposed class counsel be appointed, pursuant to Federal Rule of Civil Procedure 23(g).

## IV.    OBJECTIONS

Any written objections to this report and recommendation must be filed with the Clerk of the Court within fourteen days of service.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen-day period for filing objections. Failure to file objections within fourteen days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.  See Miller v. Brightstar Asia, Ltd., 43 F. 4th 112, 120 (2d Cir. 2022) (reasoning that, "although Rule 72 applies only to the district court's review of a report and recommendation, this court has adopted the rule that when a party fails to object timely to a magistrate's recommended decision, it waives any right to further review of that decision") (internal citation & quotations omitted).

Dated: Brooklyn, New York
        August 25, 2023

*Vera M. Scanlon*
        VERA M. SCANLON
        United States Magistrate Judge